No. 15-12731-G

IN THE
**UNITED STATES COURT OF APPEALS**
FOR THE
**ELEVENTH CIRCUIT**
_____

LARRY KLAYMAN,
*Plaintiff-Appellant*

*v.*

CITY PAGES, ET. AL.,
*Defendants-Appellees*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

(CASE NO: 5:13-CV-00143-ACC-PRL)

_____

**PLAINTIFF-APPELLANT'S INITIAL BRIEF**
_____

LARRY KLAYMAN
2775 NW 49th Ave., Suite 205-346
Ocala, FL 34483
(310) 595-0800
Email: leklayman@gmail.com

*Plaintiff-Appellant Pro Se And*
*As Member of the Eleventh Circuit*

DATED: August 18, 2015

## CERTIFICATE OF INTERESTED PERSONS

Plaintiff-Appellant Larry Klayman certifies that the following is a complete list of the trial judge, attorneys, persons, associations of persons, firms, partnerships, or corporations known to it that have an interest in the outcome of this case as defined by U.S. Court of Appeals for the Eleventh Circuit Local Rule 26.1-1:

Trial Judge:

 The Honorable Anne C. Conway

Attorneys:

 Larry Klayman

 Sanford L. Bohrer

 Scott D. Ponce

Persons, association of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal:


| | |
|---|---|
| Larry Klayman | Aaron Rupar |
| City Pages, LLC | Matthew Hendley |
| Phoenix New Times, LLC. | Ken Avidor |
| Voice Media Group, Inc. | The law firm of Holland & Knight, LLP |

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiff-Appellant believes that oral argument is essential and appropriate to the determination of the issue on appeal.  This case involves a complex issue of law under the First Amendment to the U.S. Constitution and oral argument would aid this Court in its determination of the law at issue.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS…………………………………ii

STATEMENT REGARDING ORAL ARGUMENT……………………………..iii

TABLE OF AUTHORITIES……………………………………………………….v

STATEMENT OF JURISDICTION………………………………………………1

STATEMENT OF THE ISSUES…………………………………………………..2

STATEMENT OF THE CASE……………………………………………………4

STANDARD OF REVIEW………………………………………………………16

SUMMARY OF THE ARGUMENT……………………………………………..16

ARGUMENT…………………………………………………………………...17

CONCLUSION…………………………………………………………………...59

CERTIFICATE OF COMPLIANCE…………………………………………...61

CERTIFICATE OF SERVICE……………………………………………………62

STATUTORY ADDENDUM……………………………………………………63

# TABLE OF AUTHORITIES

## Cases

*Bowles v. Osmose Utils. Svcs.*, *Inc.*, 443 F.3d 671 (8th Cir. 2006) ........................46

*Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001)..................................................52

*Dimick v. Schiedt*, 293 U.S. 474 (1935)....................................................................59

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) ...............................................50

*Espey v. Wainwright*, 734 F.2d 748 (11th Cir. 1994) ...............................................53

*Foman v. Davis*, 371 U.S. 178 (1962) ......................................................................52

*Fund for Animals, Inc. v. Rice,* 85 F.3d 535 (11th Cir.1996)..................................16

*Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir.

   1983) .......................................................................................................................37

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969) ................................ 29, 30, 32

*Grayson v. Kmart Corp.*, 79 F.3d 1096 (11th Cir. 1996) .........................................53

*Griffith Labs. U.S.A., Inc. v. Pomper*, 607 F. Supp. 999 (S.D.N.Y. 1985) .............44

*Guam Fed'n of Teachers v. Ysrael,* 492 F.2d 438 (9th Cir. 1974)...........................29

*Guillen v. Kuykendall*, 470 F.2d 745 (5th Cir. 1972) ....................................... 43, 44

*Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989)...................31

*Herbert v. Lando*, 441 U.S. 153 (1979) ...................................................................33

*In re Landbank Equity Corp.*, 83 B.R. 362 (E.D. Va. 1987) ............................ 43, 44

*Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38 (D.D.C. 2001) .............................18

*Jacobs v. Central Transport, Inc.,* 891 F. Supp. 1088  (E.D.N.C. 1995)...............53

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008).....................................38

*Khawar v. Globe Int'l, Inc.*, 965 P.2d 696 (Cal. 1998)...........................................31

*Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984)...............29

*Liteky v. United States*, 510 U.S. 540 (1994)..........................................................18

*Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270 (M.D. Fla. 2002) ...................54

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980).......................................................17

*Neill v. Gulf Stream Coach, Inc.*, 966 F. Supp. 1149 (M.D. Fla. 1997)........... 50, 52

*Newell v. Wis. Teamsters Joint Council No. 39*, No. 05-C-552, 2007 WL 2874938

    (E.D. Wis. Sept. 28, 2007).....................................................................................43

*Newton v. National Broadcasting Co.,* 930 F.2d 662 (9th Cir. 1990)....................41

*Norfolk & P. Traction Co. v. Miller*, 174 F. 607 (4th Cir. 1909) ...........................43

*Rebozo v. Wash. Post Co.*, 637 F.2d 375 (5th Cir. 1981) .......................................36

*Richardson v. United States*, 193 F.3d 545 (D.C. Cir. 1999) .................................52

*Salgado v. Land O' Lakes, Inc.,* 2014 U.S. Dist. LEXIS 128242 (E.D. Cal. Sept.

    12, 2014)..................................................................................................................57

*SCo Group, Inc. v. Novell, Inc.,* 439 Fed. Appx. 688 (10th Cir. 2011)..................41

*Scutieri v. Paige*, 808 F.2d 785 (11th. Cir. 1987)....................................... 44, 45, 46

*Smith v. School Bd. Of Orange County*, 487 F.3d 1361 (11th Cir. 2007) ........ 52, 56

*Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417 (11th Cir. 1998)......................................54

*Southern Coast Corp. v. Sinclair Refining Co.*, 181 F.2d 960 (5th Cir. 1950) .......53

*Sprague v. Walter*, 656 A.2d 890 (Pa. Super. Ct. 1995)...........................................31

*St. Amant v. Thompson*, 390 U.S. 727 (1968)............................................. 32, 33, 42

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987)................................................37

*Thomas v. Town of Davie*, 847 F.2d 771 (11th Cir. 1988) ......................................52

*Valero Mktg. & Supply Co. v. Southcap Pipe Line Co.*, 2010 U.S. Dist. LEXIS

    103875, 1-2 (S.D. Ill. Sept. 29, 2010) ......................................................... 53, 56

*Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980)................................................51

*Ward v. City of Monroeville*, 409 U.S. 57 (1972)....................................................17

*Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758 (Ky. 1990)................35

*Welch v. Celotex Corp.,* 951 F.2d 1235 (11th Cir.1992).........................................16

*Wouters v. Martin County, Florida,* 9 F.3d 924 (11th Cir.1993) ...........................16

*York v. United States*, 785 A.2d 651 (D.C. 2001)....................................................18

**Statutes**

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 1292(b) .................................................................................................16

28 U.S.C. § 1332........................................................................................................1

28 U.S.C. § 455(a) ...................................................................................................19

28 U.SC § 144...........................................................................................................19

Florida Statute § 768.72 .................................................... 12, 13, 49, 51, 55, 57, 58

**Other Authorities**

ABA Code Of Judicial Conduct Canon 3(C)(1) ....................................................18

David A. Elder, Defamation: A Lawyer's Guide § 7:5, At 64-65 & N.25 (1993) ..35

John C. Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U.

    Chi. Legal F. 293, 295 (1993) ...............................................................37

Leslie W. Abramson, Judicial Disqualification Under Canon 3 of the Code of

    Judicial Conduct 10 (2d ed. 1992).......................................................18

Restatement (Second) of Torts § 580A, cmt. D (1977)...........................................37

**Rules**

Fed. R. App. P. 4(a)(1)(A) ....................................................................1

Fed. R. Civ. P. 15(a)(2)........................................................................51

Fed. R. Civ. P. 16(b) ........................................................... 51, 54, 55, 59

Fed. R. Civ. P. 30(b)(6).......................................................................47

Fed. R. Civ. P. 54(c)..........................................................................44

Fed. R. Civ. P. 8 ..............................................................................50

Fed. R. Civ. P. 8(a)(3)................................................................... 42, 44

Fed. R. Civ. P. 9 ..............................................................................50

Fed. R. Civ. P. 9(g) ..................................................................... 44, 50

## STATEMENT OF JURISDICTION

The U.S. District Court for the Middle District of Florida ("District Court") had diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 as there was a controversy in excess of $75,000 between citizens of a state and subjects and persons of a foreign state.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 as it is an appeal from a final decision of a district court entered on April 3, 2015 with reconsideration denied on June 9, 2015. Docs. 125,142. The appeal was timely, as it was filed within 30 days of entry of the final decision on June 15, 2015. Doc. 144; Fed. R. App. P. 4(a)(1)(A).

## INTRODUCTION

This lawsuit arises from Defendants-Appellees City Pages, Phoenix New Times, Voice Media Group, Ken Avidor, Matthew Hendley, and Aaron Rupar (collectively, "Defendants") willful and malicious publication of false and per se defamatory statements regarding Plaintiff-Appellant in three widely circulated articles, which falsely accused Plaintiff-Appellant of committing a crime and/or being convicted of a crime by sexually abusing his own children, and stealing money from a client he was legally representing. Defendants-Appellees intentionally publicized these false statements to harm Plaintiff-Appellant, his reputation, and his standing as a reputable lawyer.

1

As a result of Defendants-Appellees' wide dissemination of the above defamatory accusations, Plaintiff-Appellant has been harmed in his reputation, particularly as an attorney and civil rights activist, in addition to being injured in his personal, social, official, and business relations.

The District Court granted summary judgment in favor of Defendants-Appellees, finding that Plaintiff-Appellant had not demonstrated the requisite constitutional malice required for a claim of defamation against a public figure.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in refusing to recuse itself from the proceedings when it was clear that there was an extra-judicial bias and prejudice against Plaintiff-Appellant Klayman?

2. Whether the District Court erred in granting summary judgment by finding that Plaintiff-Appellant had not demonstrated constitutional malice?

3. Whether the District Court erred in finding that circumstantial evidence was not enough to show constitutional malice?

4. Whether the District Court erred in taking the determination of constitutional malice away from the jury and deciding it on its own during summary judgment?

5. Whether Plaintiff-Appellant pled a prayer for punitive relief in his complaint when he stated: "[A]t a later time appropriate time, a prayer for punitive damages will also be pled?"

6. Whether Plaintiff-Appellant's statement that "[A]t a later time appropriate time, a prayer for punitive damages will also be pled" gave sufficient notice to the Defendants that punitive damages would be sought?

7. Whether the factual allegations in Plaintiff-Appellant's complaint were sufficient under FRCP Rule 8(a)(3) to give Defendants-Appellees notice that punitive damages would be sought thus eliminating the need to explicitly state that punitive damages were sought?

8. Whether the District Court erred in refusing to allow Plaintiff-Appellant to amend the complaint after Plaintiff-Appellant had shown good cause as to why amendment was proper and necessary and no prejudice was being caused to Defendants-Appellees?

9. Whether the District Court erred in failing to provide Plaintiff-Appellant a means of amending his complaint to add a prayer for relief for punitive damages when Florida Statute § 768.72 specifically provides that Plaintiff-Appellant may amend a complaint upon showing of a reasonable basis for the inclusion of such damages?

## STATEMENT OF THE CASE

Plaintiff-Appellant is a lawyer licensed to practice in Florida (and in other jurisdictions) and has at all times been a member in good standing throughout his approximate 38-year career as an attorney. Third Amended Complaint ("TAC") ¶2 (Docket No. 52). Plaintiff-Appellant practices law continuously and extensively, throughout the country and within Florida and resides in and does business in this judicial district. TAC ¶2. In 2004, Plaintiff-Appellant ran as a candidate for the U.S. Senate in Florida in the Republican primary. TAC ¶2.

Defendants-Appellees are activists and supporters of the radical, pro-homosexual, pro-illegal immigration movement and, as a result, sought to punish Plaintiff-Appellant for his conservative views and legal advocacy of his perceived conservative positions by destroying Plaintiff-Appellant's reputation, both personally and professionally, while perpetuating their own political agenda. TAC ¶9.[1] In order to achieve their goal to harm Plaintiff, Defendants-Appellees willfully published three separate and widely circulated defamatory articles, entitled "Bradlee Dean's Attorney, Larry Klayman, Allegedly Sexually Abused his own Children," dated September 28, 2012, "Birther Lawyer Fighting Joe Arpaio Recall was Found to have 'Inappropriately Touched' his Kids," dated February 22, 2013,

---

[1] Plaintiff-Appellant is not homophobic and has friends who are gay. During discovery, Defendants-Appellees could not cite any homophobic statement made by Plaintiff-Appellant.

4

and "Larry Klayman Under Investigation by Arizona Bar," dated June 18, 2013.
TAC ¶¶10, 11, 13, 14. In these articles, Defendants-Appellees deliberately
published false statements accusing Plaintiff-Appellant of committing and/or being
convicted of a crime as well as stealing money from a client he was legally
representing.  TAC ¶¶ 10,15.

   A. *Defendants-Appellees' September 28, 2012 Article*

   Plaintiff-Appellant had been legally representing Bradlee Dean ("Dean"), a
Christian preacher and musician who, through his ministry "You Can Run But You
Cannot Hide," teaches children Judeo-Christian ethics and morals. TAC ¶10.
Moreover, Dean is recognized for his advocacy in opposing the radical gay agenda
of promoting homosexual behavior and lifestyle to children in schools. *Id.*

   On September 28, 2012, Defendants-Appellees published an article entitled
"Bradlee Dean's Attorney, Larry Klayman, Allegedly Sexually Abused his Own
Children," which falsely stated that Plaintiff-Appellant had sexually abused his
own kids. TAC ¶10,11. The article concluded with the statement, "[t]urns out, gays
aren't the only ones capable of disturbing, criminal sexual behavior-apparently
even conservative straight guys tight with Bradlee Dean turn out to be total
creeps."  TAC ¶11(Emphasis added). This article was clearly intended to harm
Plaintiff-Appellant personally and professionally because of his legal

representation of Bradlee Dean in *Bradlee Dean, et al. v. NBC Universal, et al.*
(D.C. Superior Court, No. 2011 CA 006055B). TAC ¶10.

Despite Defendants-Appellees' false accusation, Plaintiff-Appellant has
never been found by any legal entity or agency to have sexually abused his
children, much more committed or been convicted of a crime in this regard. TAC
¶12. Contrary to Defendants-Appellees' publication, Plaintiff-Appellant was
cleared of these false charges by the Cleveland Department of Children and
Families, the Cuyahoga County Sheriff's Department, and the District Attorney, all
of whom dismissed these false and unsubstantiated allegations made by Plaintiff-
Appellant's ex-wife during a highly contested custody proceeding. TAC ¶12.
Further, Plaintiff-Appellant voluntarily took and passed a polygraph examination,
evidencing that Plaintiff-Appellant did not sexually abuse his own children. TAC
¶12. Importantly, the entirety of the evidence clearing Plaintiff-Appellant of all
charges was part of the public court record. As significantly, Plaintiff-Appellant's
children even admitted that Plaintiff-Appellant's ex-wife had attempted to coach
them regarding the sexual abuse allegations, but they, themselves, could not
remember nor did they know of any inappropriate touching by Plaintiff-Appellant.
In fact, they themselves denied the accusations. *Id.*

Undoubtedly, evidence regarding the truth of whether Plaintiff-Appellant
committed and/or was convicted of the accused crime, is readily available and

accessible to the public, and particularly to Defendants-Appellees, who purport to be investigative "journalists."  TAC ¶16. Defendants intentionally ignored readily available documents evidencing the falsity of Defendants-Appellees' accusations and instead, willfully falsified facts, and omitted significant details in their publications in order to intentionally discredit Plaintiff-Appellant and severely harm his reputation due to his representation of Bradlee Dean. TAC ¶21.

Moreover, Defendants-Appellees omitted to state that the referenced finding of the Cleveland magistrate and judge remained subject to court challenge, that the magistrate who made the initial finding was biased and prejudiced against Plaintiff-Appellant for his political and religious beliefs. TAC ¶¶43, 49. Most significantly, the magistrate's decision never states that Plaintiff-Appellant had committed sexual abuse. Other omissions by Defendants-Appellees include, but are not limited to, Plaintiff-Appellant Klayman had taken a polygraph which confirmed that he did not sexually abuse and/or inappropriately touch his children's private parts, and that the matter had been thoroughly investigated by the Cleveland Department of Families and the Cuyahoga County Sheriff and District Attorney, all of whom came to identical findings and conclusions. *Id.*

### B. *Defendants-Appellees' February 22, 2013 Article*

On February 22, 2013, Defendants-Appellees published yet another article, entitled "Birther Lawyer Fighting Joe Arpaio Recall was Found to have

'Inappropriately Touched' his Kids," again seeking to attack Plaintiff-Appellant for his legal advocacy. TAC ¶13. Specifically, Plaintiff-Appellant represented a group of Arizona citizens, "The Citizens to Protect Fair Election Results," who oppose an illegal recall petition to remove Sheriff Joe Arpaio in Maricopa County, Arizona. *Id.* Specifically, Sheriff Joe Arpaio is known for his strong enforcement of immigration laws in Arizona and is supported by many Arizona residents, as evidenced by his continued reelection as Sheriff. *Id.* Defendants-Appellees have shown a malicious hatred for Sheriff Arpaio, particularly as a result of Defendants-Appellees' pro-illegal immigration legal position and law enforcement activities.

Defendants-Appellees viewed Plaintiff-Appellant as aiding the Sheriff in the election recall matter and, once again, sought to impair Plaintiff-Appellant's reputation and impede and harm on his legal representation. *Id.* In their February 22, 2013 article, Defendants-Appellees admit that they were corroborating with their sister publication, City Pages, from which they received false information about Plaintiff-Appellant's alleged child sex abuse. *Id.* In fact, this article links and thus republishes[2] the previously published libelous article of September 28, 2012 and thus, Defendants-Appellees once again libeled, defamed, and defamed Plaintiff-Appellant by implication through this republication, further injuring Plaintiff-Appellant and harming his reputation. *Id.*

---

[2] Plaintiff-Appellant incorporates by reference his Motion For Reconsideration (Docket No. 111).

### C.    *Defendants-Appellees' June 18, 2013 Article*

On June 18, 2013, Defendants-Appellees published another article entitled "Larry Klayman Under Investigation By Arizona Bar," which contained the false statement that "Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by The Florida Bar in 2011 for **taking money from a client, and never doing any work**." TAC ¶¶14,15 (Emphasis added).  Defendants-Appellees have at their disposal the public agreed-upon consent judgment that was referenced in their June 18, 2013 article and, as a result, were fully informed of the falsity of their statement but knowingly and willingly proceeded to publish the defamatory article. TAC ¶16.  In fact, the public information, which was available to Defendants-Appellees, clearly evidenced that Plaintiff-Appellant did do considerable work for his client and that Defendants-Appellees' accusation was not the basis of The Florida Bar matter. *Id.*

As made clear in the public consent judgment which was at Defendants-Appellees' disposal, Plaintiff-Appellant had entered into a settlement agreement with a former client, Natalia Humm, wherein Plaintiff-Appellant agreed to pay $5,000 out of a $25,000 non-refundable retainer, at the urging of a Florida Bar mediator to amicably resolve this matter and to put the matter behind him. Klayman Affidavit (Docket No. 104-1) ¶5. At the time, Plaintiff-Appellant

believed that he could pay the amount to the former client. *Id.* Plaintiff-Appellant had made ongoing installment payments to the former client, and there was not much left that remained to be paid. *Id.* However, the bar filed a complaint after its letter, which could have averted the complaint, could not reach Plaintiff-Appellant due to changes of address and the subsequent confusion this caused. *Id.* The complaint was only filed after Plaintiff-Appellant inadvertently did not timely respond. *Id.*

Importantly, as set forth in the public consent judgment, the lawyer who succeeded Plaintiff-Appellant in the representation of the client, who was prepared to testify had this case not been dismissed by the District Court, admitted to Plaintiff-Appellant that he did not owe the client a refund and that he did not expect Plaintiff-Appellant to make payment. Notwithstanding this, Plaintiff-Appellant had every intention to pay the agreed upon amount to the client. However, a severe recession hit the economy and he had personal issues, and a near fatal automobile accident which prevented timely payment. Klayman Affidavit (Docket No. 104-1) ¶4. In short, the reprimand did not result from dishonesty or any other egregious ethical violation; rather, it was just a matter of not having the money to timely pay the settlement. *Id.* Indeed, the public consent judgment, which Defendants-Appellees had at their disposal, clearly states the many mitigating circumstances with regard to the Florida matter including:

10

absence of prior disciplinary record, personal or emotional problems at the time

because of the false allegations of sexual abuse, character or reputation, and

remorse. *Id.*

Regrettably, these despicable and outrageous false and misleading

statements were widely circulated, both nationally and internationally, and

publicized in print, on the internet, through e-mail subscriptions, and at nationwide

events, particularly given the extensive distribution and readership of Defendants-

Appellees' publications. TAC ¶22.  Defendant-Appellee Voice Media Group's

holdings include Defendant-Appellee City Pages and Phoenix New Times as well

as Village Voice, LA Weekly, SF Weekly, and other New Times publications

throughout the United States. TAC ¶9. Further perpetuating the dissemination of

Defendants-Appellees' defamatory statement, and thus, further harming Plaintiff's

reputation, is the fact that Defendant-Appellee Voice Media Group, a privately

held media company, reaches more than 7 million monthly readers in print and 16

million unique desktop visitors each month, in addition to 1.2 million e-mail

subscribers, more than 5.7 million visits on mobile, and more than forty signature

food, music, and arts events per year nationwide. TAC ¶9.

There is no doubt that Plaintiff-Appellant has been severely harmed as a

result of Defendants-Appellees' defamatory statements, which have considerably

lowered him in the estimation of the community, injured him in his occupation as a

leading lawyer, and subjected him to hatred, ridicule, and contempt. TAC ¶¶21, 30. More specifically, Defendants-Appellees' tirade of defamatory statements did, in fact, extensively harm Plaintiff-Appellant's reputation, cripple his integrity as a lawyer, and impair his credibility in a manner that impeded on Plaintiff-Appellant's ability to practice law. *Id.* Furthermore, Defendants-Appellees' spreading of libelous and defamatory material about Plaintiff-Appellant has caused serious injury to his profession and community standing and has adversely affected his legal advocacy, leading the public to question his fitness to practice law. *Id.*

On March 20, 2013, Plaintiff-Appellant filed a Complaint in this action. Pursuant to Florida law, he immediately put Defendants-Appellees on notice that punitive damages would be sought since under Florida Statute § 768.72, a plaintiff is permitted to plead punitive damages only after there is a reasonable showing by evidence on the record that punitive damages are warranted. This prayer for relief thus put Defendants-Appellees on notice that Plaintiff-Appellant would be seeking punitive damages.

This case continued for 17 months without a word from Defendants-Appellees regarding punitive damages. In August of 2014, an issue arose in discovery as to whether Plaintiff-Appellant was entitled to information about Defendants-Appellees' net worth since net worth bears on an amount a jury may award for punitive damages. Defendants-Appellees objected to producing this

information and filed a Motion for Protective Order (Docket No. 59) claiming for

the first time, and long into this case, that Plaintiff-Appellant had not sufficiently

pled punitive damages and therefore he should not be entitled to information about

net worth.

Seeking to eliminate this issue, Plaintiff-Appellant filed a Motion to

Correct/Amend Third Amended Complaint (Docket No. 67) with the District Court

in order to clarify and confirm that he had pled punitive damages correctly under

Florida law. On September 4, 2014, the District Court denied this motion[3] without

prejudice and referred this matter to the Magistrate. In entering a protective order

and finding that information about net worth need not be produced at that time, the

Magistrate Judge did not foreclose Plaintiff-Appellant from moving to amend the

complaint at the close of discovery, when more information would be available

bearing on the issue of punitive damages under Florida Statute § 768.72.

Specifically, the Magistrate ruled, "[s]ection 768.72 . . . prohibits any allegation of

punitive damages until permitted by the court after a 'reasonable showing by

evidence in the record or proffered by the claimant which would provide a

---

[3] The District Court denied the motion to amend with a minute order which read as follows: "ORDER denying 67 motion to amend/correct. The deadline for amending has past. No good cause is shown. Discovery will be permitted based on the issues raised in the Third Amended Complaint. Whether that includes punitive damages is a matter to be determined by the Magistrate Judge if requested. Signed by Chief Judge Anne C. Conway on 9/4/2014. (Conway, Anne) (Entered: 09/04/2014)"

reasonable basis for recovery of such damages.'" Fla. Stat. § 768.72(1). The Magistrate Judge continued, "[u]nless and until Plaintiff pleads a claim for punitive damages, it would be premature to allow discovery on net worth." This is the reason why Plaintiff-Appellant did not object to the Magistrate's order appealing it to the Judge, since discovery was ongoing.

Importantly, the issue as to whether Plaintiff-Appellant had properly pled punitive damages did not arise until the District Court's initial deadline to amend the complaint had passed on December 12, 2013. This deadline, occurring almost a year and a half before trial is scheduled to begin on April 1, 2015, could not have logically been meant to foreclose later amendments to the complaint as discovery progressed and concluded.

When Defendants-Appellees finally produced documents on the last day of the discovery period, September 22, 2014, an extremely important and compelling document was disclosed. This document was the blog posting of Ken Avidor wherein he viciously defamed Plaintiff-Appellant by comparing him to a teacher who spoon-fed his students semen. The document was crucial because not only was it linked to the article of Defendant-Appellee Rupar which contained the headline "Bradlee Dean's Lawyer Larry Klayman: Allegations of Sexual Abuse to Children" and which later in the posting told readers that Plaintiff-Appellant had committed a crime when he did not, but it also equated Plaintiff-Appellant with

infamous pedophiles who had been convicted of crimes, such as the perverted school teacher who fed his students semen, and Jerry Sandusky, the Pennsylvania State football assistant coach who is a *convicted* serial child molester.

Thus, given the production of this document, it was a proper time to amend the complaint, pursuant to Florida Statute § 768.72, in order to perfect the prayer for relief to include more specifically a prayer for punitive damages. In this regard, Plaintiff-Appellant filed a detailed motion on November 20, 2014 (Docket No. 106) setting forth with good cause why punitive damages could now be fully pled. Indeed, this motion was filed on the last date provided by this Court for the motion to be filed, and thus the motion was filed timely.

The District Court once again inexplicably denied this motion, stating that amendment of the complaint would not be proper under the FRCP Rule 16 as Plaintiff-Appellant had moved to amend the complaint after the deadline for amending complaints that was set in the Case Management and Scheduling Order ("Case Management Order")(Docket No 36).  Incredibly, the District Court held that "the Court is convinced that Plaintiff has (again) not shown good cause to justify amending his pleadings."  Order of December 8, 2014 (Docket No. 110) at p. 4.

On December 10, 2014 Plaintiff-Appellant moved the District Court for reconsideration of the December 8, 2014 Order (Docket No. 111) and also moved

to certify the issue for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b), only to have this motion denied on January 12, 2015 (Docket No. 115).

On April 3, 2015, the District Court granted summary judgment in favor of Defendants. On May 1, 2015, Plaintiff-Appellant moved for reconsideration of the District Court's granting of summary judgment (Docket No. 133) and on May 20, 2015, Plaintiff-Appellant was regrettably forced to move for the Court's recusal and/or disqualification (Docket 139). On June 8, 2015, the District Court denied Plaintiff-Appellant's motion for recusal and/or disqualification. On June 9, 2015 the District Court denied Plaintiff-Appellant's Motion for Reconsideration.

## STANDARD OF REVIEW

This Court reviews a District Court's grant of summary judgment *de novo*. *Wouters v. Martin County, Florida,* 9 F.3d 924, 928 (11th Cir.1993). This Court reviews the record and all inferences therefrom in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992). The district court's decisions concerning discovery are reviewed under an abuse of discretion standard. *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 542 (11th Cir.1996).

## SUMMARY OF THE ARGUMENT

This Court must respectfully reverse and remand the decision of the U.S. District Court for the Middle District of Florida and vacate all District Court

Orders, as the trial judge should have recused herself from the case once her bias and prejudice manifested itself.  The District Court further erred in granting summary judgment and determining that Plaintiff-Appellant did not show constitutional malice.  Plaintiff-Appellant had demonstrated with circumstantial evidence that Defendants-Appellees were knowingly making false and defamatory statements or making them with reckless disregard for the truth. Finally, the District Court erred by granting summary judgment because it was for the jury to determine whether constitutional malice was present and it was not for the Court to decide this issue.

## **ARGUMENT**

## **RECUSAL OF DISTRICT COURT WAS NECESSARY**

The District Court erred in refusing to recuse itself from this lawsuit. An impartial judiciary is a fundamental component of the system of justice in the United States. The right to a "neutral and detached judge" in any proceeding is protected by the Constitution and is an integral part of maintaining the public's confidence in the judicial system. *Ward v. City of Monroeville*, 409 U.S. 57, 61-62 (1972). *See also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980) ("powerful" constitutional interest in fair adjudicative procedure"). Congress has sought to secure the impartiality of judges by requiring them to step aside, or in some instances, disqualify themselves, in various circumstances.

In order to preserve the integrity of the judiciary, and to ensure that justice is carried out in each individual case, judges must adhere to high standards of conduct." *York v. United States*, 785 A.2d 651, 655 (D.C. 2001).  "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned. . . ." ABA Code Of Judicial Conduct Canon 3(C)(1).

The Judicial Code leaves no doubt that that recusal process is to be self-executing, as the judge should not unethically wait for a recusal motion to be filed. **"It is intended to be used by a judge at the start of each case as a checklist to assist in deciding whether at that point he should disqualify himself from any participation in the proceedings . . . [E]ven before appraising participation in the case under the [Judicial Code], the judge should first consult his own emotions and conscience, and pass an 'internal test of freedom' from disabling conflicts."** Leslie W. Abramson, Judicial Disqualification Under Canon 3 of the Code of Judicial Conduct 10 (2d ed. 1992).

Recusal is required when there is even the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism' to defendants' position that 'fair judgment is impossible.'" *Liteky v. United States*, 510 U.S. 540, 555 (1994); *See also Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38, 40 (D.D.C. 2001) (recusal was proper because the judge "ha[d] created an appearance of personal

bias or prejudice"). The considerable basis for the Court's recusal and/or disqualification is found Plaintiff's Motion for Disqualification Pursuant to 28 U.SC § 144 and 28 U.S.C. § 455(a)(Docket No. 139). Because this Court did not grant Plaintiff's motion to extend the word limitation for an initial brief by 3,000 words, Plaintiff is forced to incorporate by reference these pleadings and respectfully requests that the Court review them in rendering its ultimate decision. The issue of recusal will also be addressed in Plaintiff's reply brief.

Having moved pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455, the District Court's actual judgment shows extrajudicial bias against Plaintiff-Appellant. For instance, in a mocking and condescending fashion, the District Court fashions the entirety of the Order in the theme of Alice in Wonderland, a fictional novel by Lewis Carroll. Plaintiff-Appellant has been a distinguished attorney for over 38 years. This is no way for a judge to act towards a lawyer.

The District Court made statements mocking and insulting Plaintiff-Appellant and his ability to practice law. For example, The District Court wrote:

> ***I've been considering words that start with the letter M. Moron. Mutiny. Murder. Mmm-malice.*** (Docket No. 124)(How many times has a court in the history of civil litigation used the word "moron" in a pleading and inferred that it applied to a lawyer litigant?)
>
> ***Seventh, and venturing deeper into Wonderland, Plaintiff argues as evidence of actual malice that Avidor and Rupar sought to sell Avidor's "malicious book" featuring "a computer doctored photo maliciously designed to make [Michele] Bachmann look like a***

*deranged lunatic."* (*Id.* at p. 22–23). (The picture was in fact computer-doctored as the Defendants know full well).

*Down the Rabbit Hole - "Would you tell me, please, which way I ought to go from here?" "That depends a good deal on where you want to get to," said the Cat. "I don't much care where—" said Alice. "Then it doesn't matter which way you go," said the Cat. "–so long as I get somewhere," Alice added as an explanation. "Oh, you're sure to do that," said the Cat, "if you only walk long enough."* (*Id.* at p.13).

*The Court learned early on in this case that this approach to litigation is the norm and not the exception for Plaintiff.* (*Id.* at p.14).

Most tellingly, the District Court issued an unwarranted threat and

admonition towards Plaintiff-Appellant at the close of the summary judgment

order, even taking offense to his having filed a petition for writ of mandamus with

the Eleventh Circuit, which was his legal right. Specifically, the District Court

wrote:

> While the Court would not ordinarily conclude with an admonition, this is, of course, no ordinary case. Plaintiff's approach to this litigation has been quite suspect, to say the least. As has been made clear in this case, as well as through reviewing the relevant proceedings at issue, when Plaintiff receives unfavorable rulings, **he often plunges into a tirade against whomever he feels has wronged him—here, it has taken the form of motions to reconsider, objections, and even a petition for writ of mandamus with the Eleventh Circuit Court of Appeals**. This is all to say that the Court will review any motion for reconsideration of this Order with a very sharp lens. Should Plaintiff file a motion to reconsider, the Court forewarns Plaintiff that any such motion must at least arguably meet the stringent standard for reconsideration of an Order, at the risk of facing sanctions from the Court. To this end, Plaintiff should keep in mind his obligations under Federal Rule of Civil Procedure 11.

Order (Docket No. 124) at p. 32 (emphasis added).

In short, the District Court characterizes Plaintiff-Appellees' case as little more than a bad joke. The District Court believes it is appropriate to write quotes about "Moron[s]" and "Murder[ers]" in its Order granting summary judgment in favor of Defendants. The District Court, which itself had launched into a tirade – there is no showing on the record that Plaintiff-Appellant did so -- mocks, scoffs at and ridicules Plaintiff-Appellant via a Lewis Carroll *fictional novel* titled "Alice In Wonderland" and as a result, shows its cards that *maliciously* defaming someone by accusing that person of sexually abusing his own children and failing to provide services as a lawyer, but instead stealing a client's money, are some sort of simple "off the cuff" remarks that can go unscathed and unremedied. The District Court, in essence, uses its disrespectful and offensive Alice in Wonderland analogies to reveal its disdain for and extrajudicial bias and prejudice against Plaintiff-Appellant.  According to the District Court, Plaintiff-Appellant's been trashed illegally by Defendants-Appellees is simply a fantasy, steeped in Wonderland. This language is unbecoming of a federal court judge who, under her oath of office, is to administer the laws, not berate and demeanor litigants.

## PLAINTIFF-APPELLANT DEMONSTRATED CONSTITUTIONAL MALICE

### A. *Evidence Existed In The Record That Defendants-Appellees Knew Of Falsity Or Acted With Reckless Disregard.*

#### 1. Defendants-Appellees Admitted On the Record They Had Reviewed Florida Bar Records Prior To Making Defamatory Statements.

The District Court erred when it found that Plaintiff-Appellant had not made a showing of constitutional malice. On June 18, 2013, Defendants-Appellees published another article, written primarily by Defendant-Appellee Matthew Hendley (*See* Deposition of Matthew Hendley (Docket No. 130-2) at 71:3-5), entitled "Larry Klayman Under Investigation By Arizona Bar," which contained the false statement that "Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by The Florida Bar in 2011 for taking money from a client, **and never doing any work**." (Emphasis added).

The District Court stated the following in its Order of April 3, 2015:

> Hendley's declaration of truth is not sufficient to automatically insure a favorable verdict, the Court finds Hendley's actions (while likely negligent), when also considering the minimal evidence discussed above, still fails to establish sufficient evidence to meet the clear and convincing standard as to Plaintiff's claims on June 18 Article.

Order (Docket No. 124) at p. 31. **Defendant-Appellee Hendley admitted that he reviewed the filings in The Florida Bar proceedings**, which were linked in the *Miami New Times* article. Hendley Depo. at 72:6 - 73:7; ("Q. And in those

22

documents, were you just simply looking at the New Times article, or did you actually get documents from my Florida Bar file after you -- after it was called to your attention by the Miami New Times? **A. That article had links to Florida Bar documents, and those are the documents I looked at.**") 83:3 - 84:6 ("**Q. BY MR. KLAYMAN: But you did testify you reviewed the documents on the link? A. Yes**. Q. And you made no effort to investigate these mitigating circumstances before writing your article, which is Plaintiff's Exhibit 3. Correct? **A. I investigated it to the extent of reviewing documents related to the case.**").

Defendant-Appellee Hendley admitted multiple times on the record that he had reviewed the Florida Bar documents.  As made clear in the public reprimand **which Hendley admitted to reviewing**, Plaintiff-Appellant had entered into a settlement agreement with a former client, Natalia Humm, wherein Plaintiff-Appellant agreed to pay a small part of a non-refundable retainer, at the urging of a Florida Bar mediator to not admit liability but instead to amicably resolve this matter and to put the matter behind him. *See* Consent judgment with Florida Bar. In fact, Humm's subsequent attorney, as the case was transferred to another district, Mark Solomon stated "[i]t is unlikely that (you) would want to refund a cent so please provide me with an explanation so that I may pass it along to Ms. Humm." (Docket 104-16). Plaintiff-Appellant had made ongoing installment payments but was having financial difficulties and could not make timely payments, as Florida, the nation and the world were going through a financial

collapse at that time. *Id.* The Florida Bar only initiated an investigation after its

correspondence, which could have averted the complaint, did not reach Plaintiff-

Appellant due to changes of address and the subsequent confusion this caused. *Id.*

at p. 5. Thus the complaint was *only* filed after Plaintiff-Appellant inadvertently

did not timely respond and had nothing to do with Plaintiff-Appellant taking

money from a client without doing work. *Id.*

> Respondent's next communication with The Bar was on August 23, 2010, when he indicated that he had been in a serious auto accident and that he continued to suffer financial distress, but promised that he would be sending an additional payment to Humm. **Respondent moved during the interim period and he claims that he did not timely receive certain correspondence from The Bar, which ultimately led to a probable cause finding and the filing of a formal complaint with the Florida Supreme Court.**
>
> With respect to his failure to provide timely responses to The Bar, Respondent submits that he did not timely receive correspondence from The Bar, as his address had changed and he inadvertently did not immediately change the address with The Florida Bar. **As a result, Respondent claims he did not timely receive notice that the Grievance Committee had made a probable cause finding or that a formal complaint had been filed in this matter, and consequently, that he did not have a timely opportunity to argue against the probable cause finding or to resolve this matter prior to a formal complaint being filed.**

*Id.* at p. 8 (emphasis added).  The Florida Bar consent judgment, which Defendant-

Appellee Hendley admitted to reviewing simply and clearly states that the only

reason for the complaint was Plaintiff-Appellant's failure to timely respond, due to

his having moved and not having updated his contact information**.  Nowhere in**

**the consent judgment does the record indicate that Plaintiff-Appellant took**

**money from a client without doing any work.**  The fact that Defendant-Appellee

Hendley admits that he reviewed the document but then still goes on to publish an

article that says Plaintiff-Appellant took money from a client without doing any

work shows that Hendley knew the statement was false or at the very least acted

with reckless disregard for the truth.  This clearly establishes the constitutional

malice required for this case to go to the jury. Defendant-Appellee Hendley did not

make a mistake, but knew exactly what he was doing: a hit piece on Plaintiff-

Appellant. Defendant-Appellee knew what he was publishing was false, but did not

care.  The record also contained evidence of "ill will" towards Plaintiff-Appellant,

which established the motive behind these defamatory statements, as discussed

below. Indeed, the "ill will" does not show constitutional malice but it does show

the motive needed to show constitutional malice that is required. There is more

than sufficient evidence to take this issue to the jury.

    2. <u>The Defendants-Appellees Acted With Reckless Regard For The Truth Because The Ohio Record Never Found That Plaintiff-Appellant</u> Had Committed Criminal Acts.

Defendant-Appellee Rupar posted a blog posting on

bradleedeaninfo.blogspot.com entitled: "Bradlee Dean's Lawyer Larry Klayman:

Allegations of Sexual Abuse to Children" on September 26, 2012. In this blog,

Defendant Rupar quotes several passages from the Ohio Court of Appeals'

decision of July 26, 2012 that affirmed the magistrate's ruling against Plaintiff-

Appellant.  One of these quoted portions contained the following:

> The magistrate further found it notable that Klayman, "for all his
> breast beating about his innocence * * * [he] scrupulously avoided
> being questioned by anyone from [children services] or from the
> Sheriff's Department about the allegations," and that he refused to
> answer any questions, repeatedly invoking his Fifth Amendment
> rights, about whether he inappropriately touched the children.

(Docket 104-14).

Indeed, **the Ohio Court of Appeals never once mentioned that Plaintiff-**

**Appellant had committed any instances of child sexual abuse** or was capable of

committing any crime.  None of the documents, including the Ohio Court of

Appeals decision, even suggests that Plaintiff-Appellant was capable of criminal

sexual conduct.

However, Defendant-Appellee Rupar uses passages such as this to proclaim

that Plaintiff-Appellant, "Allegedly Sexually Abused his Own Children" and that

he was "capable of disturbing, criminal sexual behavior." Any person, let alone a

reporter, would have realized that further investigation into the family court's

record, including the magistrate's decision that was at issue in this appeal, was

proper.

Defendant-Appellee Avidor also admits to reviewing the Ohio Court of

Appeals decision. Deposition of Kenneth Avidor (Docket No. 130-1) at 88:3-14.

("I believe, I usually – as is usually my habit in these cases when I blog, is that **I**

26

**looked for the original, and that's -- that's available, I think it was Ohio Court of Appeals, so I looked at the original document and it appeared to be, since it was on the -- it was a real court decision, it was not in any way fake or otherwise, so I determined that it was for real, and that's all I did was quote that court of appeals document** that was on the state website.") (emphasis added). Both Rupar and Avidor, admitted, under oath, to reviewing the Ohio Court of Appeals ruling and then making their false and defamatory statements about Plaintiff-Appellant. The only way that they could have read the ruling and still made the defamatory statements was if they had either made the statements knowing they were false or they made them with reckless disregard for the truth.

Defendant-Appellee Hendley was specifically asked during deposition about what documents he reviewed before writing the false and defamatory articles. When asked about the magistrate's decision from the lower Ohio court, Defendant-Appellee Hendley admitted that he reviewed documents. Henley Depo. (Docket No. 1302) at 105:18-21 (Q. BY MR. KLAYMAN: Okay. Did you go back to the magistrate's findings to see whether, in fact, he ruled that I inappropriately touched the children? **A. I reviewed several documents related to this.**). The Ohio family court extensively reviewed the evidence, or lack thereof, of child sexual abuse. Importantly, the magistrate reviewing the evidence, came to the conclusion that

there was no evidence of child sexual abuse in his decision of June 9, 2010.  In this

decision of June 9, 2010, the magistrate judge stated as follows:

> the Assistant Prosecuting Attorney to whom the matter had been
> referred by the detective from the County Sheriff's Department who
> was investigating the alleged incident that in the prosecutor's opinion
> there was insufficient evidence to present a case to the Grand Jury.

**Upon reviewing the record, it was clear that after the false accusations of child**

**sexual abuse, the Cuyahoga County Prosecutor and the Cuyahoga**

**Department of Children of Families, could find no evidence of any child**

**sexual abuse or other related wrongdoing by Plaintiff.** Indeed, the magistrate

never made a finding that Plaintiff had sexually abused his children.  When

Defendants-Appellees reviewed the record they would have come to the realization

that there were no charges ever brought against Plaintiff-Appellant and that it was

clear that he had not committed any criminal or any other inappropriate acts

towards his children.  That the Defendants-Appellees reviewed this information

and still went on to make false and defamatory statements about Plaintiff-

Appellant shows that the Defendants-Appellees acted with knowledge of the falsity

of the statements that they were making, or in the very lease were reckless with

regard to the truth.

    3. <u>A Plaintiff Need Only Show Circumstantial Evidence Of
"Constitutional Malice" In Order For The Case To Go To A Jury.</u>

The District Court erred in determining that Plaintiff-Appellant was required

to show clear and convincing evidence of constitutional malice at the summary

judgment level.  The District Court held in its Order of April 3, 2015 that:

> because the proof presented to show actual malice lacks the
> convincing clarity which the constitution demands, summary
> judgment is due to be granted in favor of Defendants on all Counts.

Order at p. 31.  However, state and federal courts have undoubtedly recognized

that "it would .  . . be rare for a defendant . . . to admit to having had serious,

unresolved doubts . . . <u>Requiring proof of recklessness "without being able to</u>

<u>adduce proof of the underlying facts from which a jury could infer recklessness . . .</u>

<u>would limit successful suits to those cases in which there is direct proof by a</u>

<u>party's admission of the ultimate fact.</u>"  *Eastwood v. Nat'l Enquirer, Inc*., 123 F.3d

1249, 1253 (9th Cir. 1997) (emphasis added) ("As we have yet to see a defendant

who admits to entertaining serious subjective doubt about the authenticity of an

article it published, <u>we must be guided by circumstantial evidence. By examining</u>

<u>the editors' actions we try to understand their motives.</u>"); *Liberty Lobby, Inc. v.*

*Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984) ("The plaintiff need not obtain

any admission of fault from the defendant."), *vacated on other grounds,* 477 U.S.

242 (1986); *Goldwater v. Ginzburg***,** 414 F.2d 324, 343 (2d Cir. 1969). If this were

not the law, "mere swearing could, as a matter of law, defeat any action to which

the *New York Times* principles are applicable." *Guam Fed'n of Teachers v. Ysrael,*

492 F.2d 438, 439 (9th Cir. 1974), *cert. denied,* 419 U.S. 872 (1974).

As shown below, Plaintiff-Appellant demonstrated, with great detail, circumstantial evidence with which a jury could find, with clear and convincing evidence, that the Defendants-Appellees were acting with constitutional malice when they made the defamatory remarks about Plaintiff.

4. <u>Plaintiff-Appellant Demonstrated Malicious Motive Which Is Circumstantial Evidence Defendants Knew Their Statements Were False Or Acted With Reckless Disregard Of The Truth.</u>

The Court erred in finding that Plaintiff-Appellant confused ill will with constitutional malice. For example, the District Court holds the following:

> Plaintiff's filings in this case make clear that he does not fully cognize the difference between constitutional actual malice and "ill will" or "hatred," often referred to as common law malice.

Order (Docket No. 124) at p. 24.

> Again, this argument confuses actual malice with common law malice. Even still, this is not evidence of even ill will, and nothing about these facts show that Defendants knew the statements at issue were false or that they entertained serious doubts about the truth of those statements.

*Id.* at p. 28.  However, as shown below, Plaintiff-Appellant was using evidence of ill will or common law malice as circumstantial evidence in order to prove that Defendants-Appellees acted with the requisite constitutional malice.

 In proving constitutional malice, a plaintiff may use evidence of all of defendants' acts in in order to establish that constitutional malice existed. *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969) ("the court properly

instructed the jurors that they should consider all the evidence concerning appellants' acts and conduct in publishing Fact in deliberating upon whether the defendants published with actual malice"); *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 668 (1989). In *Harte-Hanks*, the U.S. Supreme Court held that "it is clear that the conclusion concerning the newspaper's departure from accepted standards and the evidence of motive were merely supportive of the court's ultimate conclusion that the record "demonstrated a reckless disregard as to the truth or falsity of [defendant]'s allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury. Although courts must be careful not to place too much reliance on such factors, **a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry**." *Harte-Hanks*, 491 U.S. at 668 (internal citations omitted) (emphasis added).

Following U.S. Supreme Court precedent, relying on circumstantial evidence to prove constitutional malice has become the proper method throughout the country. *See*, *e.g.*, *Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 709 (Cal. 1998) ("To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including evidence of motive and failure to adhere to professional standards."); *Sprague v. Walter*, 656 A.2d 890, 907 (Pa. Super. Ct. 1995) ("Any

competent evidence can be used to establish actual malice.").

Thus, for the District Court to hold that Plaintiff-Appellant had only shown ill will and not constitutional malice is error. It is specifically the finding of ill will through the use of circumstantial evidence that will lead a plaintiff to demonstrate that a defendant published false statements either knowingly or with reckless disregard for the truth.

On point is *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969). In *Goldwater*, the defendant falsely published that Senator Barry Goldwater, a huge public figure and presidential candidate, was suffering from paranoia and was mentally ill. In this case, the U.S. Court of Appeals for the Second Circuit found that the defendants "were very much aware of the possible resulting harm" and that "the seriousness of the charges called for a thorough investigation but the evidence reveals only the careless utilization of slipshod and sketchy investigative techniques." *Id*. at 339. In confirming the jury's funding of liability, the Court held that, "[t]here is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity."

Indeed, constitutional malice is subjective but may be evidenced by objective data and proof of common law malice. *St. Amant v. Thompson*, 390 U.S. 727 (1968). In *St. Amant*, the U.S. Supreme Court held that there need only be

"sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." The U.S. Supreme Court continued by holding that it was the responsibility of the finder of fact, in this case a jury, to determine whether that constitutional malice existed:

> The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant v. Thompson*, 390 U.S. at 732. Further, to gather the necessary proof of malice, plaintiffs may use discovery to delve into the editorial process. *Herbert v. Lando*, 441 U.S. 153 (1979). The First Amendment imposes *no restrictions* on the types of evidence admissible to prove constitutional malice, with the U.S. Supreme Court repeatedly affirming the utilization of circumstantial evidence in proving this "critical element." *Id*. Importantly, the "finder of fact" in this case is the jury and the judge should not have taken this analysis and "finding" away from it.

    5. <u>The District Court Erred in Determining Evidence of the Editorial Process Was Not Relevant.</u>

The District Court further erred in finding that evidence of the editorial process was not relevant to the showing of constitutional malice. With regard to

the editorial process, the District Court found as follows:

> Plaintiff attacks Defendants' editorial practices and argues that Defendants "have no method to edit or correct defamatory material before it is published or even thereafter" and that Defendants have no ombudsman to review and correct articles. (Doc. No. 104 at p. 19). Plaintiff also complains that Defendants do not attend seminars on journalistic ethics. (*Id.* at pp. 19–20). Yet, Plaintiff fails to explain how this shows in any way that Defendants published the statements in question with knowledge that they were false or with reckless disregard of whether they were false or not.

Here, Plaintiff-Appellant similarly explored the editorial process of each of

the publications. Through discovery it was determined that Defendant-Appellee

City Pages has no ombudsman, does not have an editorial process, and does not

run background checks on people they hire, which as set forth above, includes

convicted felons, drug addicts and pornographers. Deposition of Andrew Nicholas

Van De Voorde ("Van De Voorde Depo.")(Docket No. 130-3) at 88:10.

Importantly, Defendants hired "reporters" who were drug users and ***actual***

convicted criminals; persons who had nothing to lose to take risks and defame

others to earn a living, as they were of questionable employability.  Defendants-

Appellees were not interested in the truth but rather hired people with no respect

for laws or ethical standards of journalism.

The District Court erred in finding that this was not relevant in the

determination of constitutional malice.  Evidence of a lack of editorial process is

used as objective evidence that collectively supports a finding of constitutional

malice. *See Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758 (Ky. 1990), *cert. denied,* 498 U.S. 1047 (1991). The *Warford* case demonstrates an example of "the well-constructed collage" that plaintiffs may construct to prove constitutional malice. David A. Elder, Defamation: A Lawyer's Guide § 7:5, At 64-65 & N.25 (1993).

In *Warford,* the court delineated numerous items of objective evidence that collectively supported a finding of constitutional malice in the case of a college basketball recruiter defamed by charges of recruiting improprieties. *Warford,* 789 S.W.2d at 772. The defendant reporters made minimal efforts to verify the credibility of their source, a student athlete, despite the plaintiff's denials just prior to publication and the plaintiff's request that the reporter contact several individuals, including the source's parents, friends, and high school coaches. *Id.* The defendants also failed to contact anyone at the plaintiff's university, including his boss, prior to the original publication. *Id.* Moreover, the defendants failed to conduct any further investigation prior to publication of the reprint, despite denials by the plaintiff and others. *Id.* In addition, the defendants conceded they were aware of the seriousness of the charge and the potential harm to the plaintiff from the pervasive dissemination to all future college and university employers. *Id.* Furthermore, the defendants delayed in contacting the plaintiff until just prior to the original publication despite the absence of a time deadline, permitting a jury to

conclude the defendants "were committed to running the story without regard to its truth or falsity." *Id* Finally, the defendants transformed the source's ambiguous statement into "the most potentially damaging alternative" creating a "jury question on whether the publication was indeed made without serious doubt as to its truthfulness." *Id.* at 772-73 (quoting *Rebozo v. Wash. Post Co.*, 637 F.2d 375, 382 (5th Cir. 1981).

Here, Plaintiff-Appellant similarly correctly and legitimately used evidence of the editorial process as circumstantial evidence Defendants-Appellees were acting with constitutional malice.  Defendants-Appellees Hendley and Rupar did not call Plaintiff-Appellant to ask for a comment prior to making the false and defamatory statements about him.  Hendley Depo. (Docket No. 130-2) at 78:1-5 (Q. And, in fact, you never bothered to call me for a comment before you wrote your article, which is Plaintiff's Exhibit 3 to defendants' depositions, did you? A. That is correct."); Rupar Dept. at 84:17-20 ("Q. In fact, you never bothered to get a comment from me about this article before you published it, did you? A. I did not.").  These were not the actions of honest reporters who were seeking to find the truth in writing articles about Plaintiff-Appellant.  These were instead the actions of two individuals hoping to cause harm to Plaintiff-Appellant by knowingly publishing false statements about Plaintiff or publishing them with reckless disregard for the truth.  The truth was never Defendants-Appellees' concern.

6.  <u>The District Court Erred In Determining That a Failure to Correct
    Was Not Relevant.</u>

The District Court respectfully erred as a matter of law when it found that

Defendants' failure to issue a correction was not relevant to the issue of

constitutional malice.  The District Court held:

> Plaintiff argues there is evidence of actual malice because Defendants
> ignored Plaintiff's letter demanding a correction to the articles. (*Id.* at
> p. 19). While there is no dispute that Defendants have yet to issue any
> corrections, (Klayman Aff. at ¶ 28), the Supreme Court has explicitly
> rejected Plaintiff's argument and stated that actual malice cannot be
> inferred from a publisher's failure to retract a statement once it learns
> it to be false. *New York Times,* 376 U.S. at 286, 84 S. Ct. 710
> ("[F]ailure to retract upon respondent's demand . . . [is] not adequate
> evidence of malice for constitutional purposes.").

Order (Docket No. 124) at p. 27. However, the District Court once again errors as

it does not recognize that the failure to retract is circumstantial evidence of

constitutional malice. Indeed, "most authorities suggest that a failure to retract, in

conjunction with other circumstances, may be used to establish the requisite level

of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in

Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993); *accord, e.g.,*

*Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) (*en banc*) (refusal to

retract can be evidence of actual malice); *Golden Bear Distrib. Sys. of Tex., Inc. v.*

*Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir. 1983), abrogated on other grounds

by *Hiller v. Mfrs. Prod. Research Grp. of N. Am., Inc.*, 59 F.3d 1514, 1520-21 (5th

Cir. 1995); Restatement (Second) of Torts § 580A, cmt. D (1977) ("Under certain

circumstances evidence [of a refusal to retract a statement after it has been demonstrated to be false] . . . might be relevant in showing recklessness at the time the statement was published.").

Defendants-Appellees' failure to retract is yet another form of circumstantial evidence that goes to prove that Defendants-Appellees either knowingly published false and defamatory statements about Plaintiff-Appellant or acted with reckless disregard for the truth. Defendants-Appellees failed to retract because it was their intention all along to harm Plaintiff-Appellant and his reputation and they did not care, either before or after the publication of the false and defamatory statements, about the truth.

    7. <u>Plaintiff-Appellant</u> <u>Presented More Than Enough For a Finding of Defamation by Implication</u>

"Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts . . ." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Defendants committed both forms of defamation by implication.

First, Defendant-Appellee Avidor quotes Bradlee Dean's statement about a teacher who was accused of feeding semen to his students. *See* Exhibit 8. This teacher was charged with "52 counts of child sex abuse." Then, Defendant-Appellee Avidor immediately juxtaposes Plaintiff-Appellant with this statement

about a teacher who was charged with 52 criminal acts.  Plaintiff-Appellant was

mentioned right after this teacher in order to create the false impression that

Plaintiff-Appellant also committed acts of child sexual abuse.  It is true that the

teacher was charged with sexually abusing children.  It is also true that the Ohio

Court of Appeals released a ruling in a *civil* lawsuit regarding Plaintiff-Appellant.

However, to place them together in the manner that Defendant-Appellee Avidor

did is done specifically in order to imply a defamatory connection between

Plaintiff-Appellant and the pervert teacher. Quite simply, **Defendants put these**

**two statements together to make the readers believe that Plaintiff was the**

**same as an alleged criminal with 52 charges against him when in fact there**

**have never been any criminal charges brought against Plaintiff**. However, this

was the impression that Defendants-Appellees wanted to create, even though they

knew it was false or they wanted to believe it was true so badly that they acted with

reckless disregard for the truth. For this reason, Defendants-Appellees committed

defamation by implication.

Further, both Defendant-Appellee Avidor and Rupar quote a selected portion

of the Ohio Court of Appeals' ruling, which they use to maintain that Plaintiff-

Appellant Klayman was found to have sexually abused his children. (Docket No.

104-15). However, Defendants-Appellees omit any reference to the record that

Plaintiff was not charged with any crimes.  Defendants-Appellees further omit the

fact that this is not a criminal lawsuit but is only a civil matter relating to the

custody of Plaintiff's children.  *Id*. By omitting the fact that this was a civil

lawsuit, and not a criminal lawsuit, Defendant-Appellee implies that Plaintiff-

Appellant was found to have committed crimes of child sexual abuse by a criminal

court, since a criminal court is ordinarily where such a matter would be taken. But,

Plaintiff-Appellant was never found to have committed any crime, sexual or

otherwise.

By titling the column as he did by referencing now dismissed child sexual

abuse allegations concerning the Plaintiff-Appellant, false charges that were long

since disposed of, and equating Plaintiff-Appellant Klayman with the convicted

school teacher who fed semen to his students and committed other perverted acts

as well as the Penn State football coach Jerry Sandusky, both Defendants Avidor

and Rupar are maliciously defaming Plaintiff-Appellant Klayman and making him

out to be a sick pervert.

False allegations of sexual abuse ruin lives.[4] Defendants-Appellees knew of

the seriousness of these allegations and made them knowing that they were false or

---

[4] *See, e.g*., Richardson, Darrell W., The Effects of a False Allegation of Child
Sexual Abuse on an Intact Middle Class Family available at: http://www.ipt-
forensics.com/journal/volume2/j2_4_7.htm  ("The Schulz (1989) and Tyler and
Brassard (1984) surveys indicate that both convicted and nonconvicted families in
which there are accusations of sexual abuse face similar problems.  High
percentages reported separation and or divorce, losing their homes, losing their
jobs, becoming dependent on the state for financial and other assistance, and losing
their social support network of friends and extended family members.")

acted with reckless disregard for the truth.  In addition, Defendants-Appellees

linked stories related to confirmed child molesters in order to ensure that the

audience fully believed that Plaintiff-Appellant was also one of them. This is a

clear-cut case of defamation by implication.

8.   The Determination of Constitutional Malice Should Have
     Been Left for the Jury to Decide

Whether there was a clear and convincing showing of constitutional malice is

a matter for the jury to decide. *See SCo Group, Inc. v. Novell, Inc.,* 439 Fed. Appx.

688, 695 (10th Cir. 2011) ("the jury was instructed to consider slanderous only

those statements uttered with constitutional malice"). Recognizing the role of the

jury in determining constitutional malice, the U.S. Court of Appeals for the Ninth

Circuit has held:

> We must attempt to discharge our constitutional responsibility to
> protect First Amendment values without unduly trenching on the fact-
> finding role of the jury and trial judge. We are mindful that in *New
> York Times, Bose*, and *Harte-Hanks*, the Supreme Court was
> fashioning a process for reviewing the evidence which permits
> judicial protection of First Amendment values while still paying due
> deference to the fact-finding role of juries, and particularly the jury's
> opportunity to observe the demeanor of the witnesses.

*Newton v. National Broadcasting Co.,* 930 F.2d 662, 672 (9th Cir. 1990). Indeed,

the jury's observation of the Defendants-Appellees' credibility is precisely what is

needed here.  Defendants-Appellees falsely claim that they did not knowingly post

false and defamatory information about Plaintiff-Appellant.  It is up to the jury to

determine whether these Defendants are credible. *See also St. Amant*, 390 U.S. at 732, supra ("The finder of fact must determine whether the publication was indeed made in good faith.").

Here, the District Court erred because it took this decision away from the jury. Plaintiff-Appellant had demonstrated, with direct and circumstantial evidence, that Defendants-Appellees had ill will towards Plaintiff-Appellant, which gave rise to a motive for knowingly publishing false and defamatory statements about him, or making the statements with reckless disregard for the truth. Plaintiff-Appellant further showed that no editorial process existed, nor did the Defendants-Appellees make any attempt to correct the record.  Based on all this evidence on the record, Plaintiff-Appellant properly established that Defendants-Appellees were acting with constitutional malice.  It was then up to the jury to make the final determination as to the liability of the Defendants-Appellees.

### B. *Plaintiff-Appellant Pled Punitive Damages and Put Defendant on Notice That he Would Seek Punitive Damages*

Plaintiff-Appellant stated, in each and every single one of his complaints that: "[A]t a later time appropriate time, a prayer for punitive damages will also be pled." TAC at p. 20.

 Courts have specifically interpreted Rule 8(a)(3) as not requiring a plaintiff to explicitly state the phrase "punitive damages" in his complaint, so long as he otherwise alleges sufficient facts in support of such a claim. In jurisdictions

governed by the Federal Rules of Civil Procedure, or equivalent state court rules, the "notice pleading" standard is utilized and general factual allegations will suffice. *See, e.g.*, *Guillen v. Kuykendall*, 470 F.2d 745, 748 (5th Cir. 1972); *Scutieri v. Paige*, 808 F.2d 785, 790-93 (11th Cir. 1987); *In re Landbank Equity Corp.*, 83 B.R. 362, 377 (E.D. Va. 1987) ("A failure to specifically plead and demand exemplary damages will not bar an award of such damages under 54(c) where the body of the complaint alleges facts sufficient to support the award.") citing *Norfolk & P. Traction Co. v. Miller*, 174 F. 607, 610 (4th Cir. 1909); *Newell v. Wis. Teamsters Joint Council No. 39*, No. 05-C-552, 2007 WL 2874938, at *3 (E.D. Wis. Sept. 28, 2007).

### C. *Plaintiff-Appellant Was Not Required to Plead Punitive Damages In Any Event*

In jurisdictions governed by the FRCP, or equivalent state court rules, the "notice pleading" standard is utilized and general factual allegations will suffice. For example, allegations that a defendant acted "willfully or with reckless disregard for the plaintiff's interests" will ordinarily be enough to give the defendant the requisite notice. *Newell,* 2007 WL 2874938, at *5.

As one court has stated, "it is not necessary for the plaintiff to explicitly demand punitive damages; however, absent an explicit demand," the plaintiff must provide sufficient notice to the defendant, via allegations in the complaint or

subsequent actions, to inform the defendant that punitive damages "are on the table." *Id.*

This goes hand in hand with FRCP Rule 54(c) Rule 54(c) provides: "[e]very other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." The interpretation of this rule is closely related to the notice theory integral to many courts' views of Rules 8(a)(3) and 9(g). Most courts interpreting Rule 54(c) have held that a claim for punitive damages is preserved, even if not specifically alleged, if a sufficient factual basis for punitive damages is pled in the complaint or the opposing party is given fair notice of the claim. *See, e.g.*, *Guillen v. Kuykendall*, 470 F.2d 745, 748 (5th Cir. 1972); *In re Landbank Equity*, 83 B.R. 362, 377 (E.D. Va. 1987); *Griffith Labs. U.S.A., Inc. v. Pomper*, 607 F. Supp. 999, 1001 (S.D.N.Y. 1985).

This Court, the U.S. Court of Appeals for the Eleventh Circuit, has found, in a case occurring in Florida, that plaintiffs can seek punitive damages without specifically demanding them in their complaint when they alleged in the complaint that the defendants acted "maliciously, wantonly, willfully, and in bad faith. . . ." *Scutieri v. Paige*, 808 F.2d 785, 791 (11th. Cir. 1987).

As this Court held in *Scutieri*:

[Defendants] disagree with that contention and claim that the court excluded the issue of punitive damages because the complaint did not explicitly request such relief in the demand for judgment, and because the court would not allow them to amend the complaint. Our review

44

of the record indicates that the district court clearly erred in not submitting the issue of punitive damages to the jury, and therefore we reverse on this point and remand for a determination of punitive damages. Plaintiffs' complaint specifically alleged that Defendants acted maliciously, wantonly, willfully and in bad faith and with a reckless disregard for Plaintiffs' rights. It alleged that Defendants' conduct was so flagrant and wanton as to justify an award of punitive damages.

*Scutieri v. Paige*, 808 F.2d at 790-791.

Here, Plaintiff-Appellant made specific references to willful and malicious

conduct no less than thirteen (13) times in his Third Amended Complaint (Docket

No. 52). The following are some examples:

Defendants **negligently, willfully, and/or  maliciously stated**… Paragraph 3 (emphasis added).

The article was **intended to negligently, willfully, and/or maliciously defame Plaintiff Klayman**…" Paragraph 10 (emphasis added).

Defendants **negligently, willfully, and/or maliciously stated**…. Paragraph 11(emphasis added).

Defendants Avidor, Rupar, CP, and VMG's above-mentioned misleading and false publications in the September 28, 2013 article concerning Plaintiff Klayman were done **negligently, willfully and/or maliciously**, and constitute libel per se, as they defamed him by accusing him of committing and/or being convicted of a crime and were made in the context of his professional, as well as personal, life and endeavors. Paragraph 27 (emphasis added).

Defendants…have **negligently, willfully, and/or maliciously** used and published the false and misleading statements first published by the Defendants to also harm Plaintiff Klayman's reputation…" Paragraph 30 (emphasis added).

Additional allegations of willful and malicious conduct appeared in paragraphs 32, 35, 41, 44, 47, 54, 56, 66, including in each of the 6 causes of action.  Thus, under this Court's holding in *Scutieri*, Plaintiff is entitled to seek punitive damages.

Even if Defendants-Appellees had not received notice via the phrase "punitive damages" or other factual allegations in the complaint, which they clearly had, some courts have looked for timely notice in later court filings. For example, the U.S. Court of Appeals for the Eighth Circuit, in *Bowles*, found that, while the plaintiff had made no mention of punitive damages in his complaint, he could nevertheless pursue such damages at trial because he placed the defendants on notice of his claim by requesting information related to the defendant's net worth in discovery three months prior to trial and by explicitly demanding punitive in his pre-trial disclosure three weeks before trial. *Bowles v. Osmose Utils. Svcs.*, *Inc*., 443 F.3d 671, 675 (8th Cir. 2006).

Plaintiff-Appellant has similarly made such a showing here.  In Plaintiff-Appellant's Initial Disclosures, dated October 22, 2013, nearly a year and a half ago, Plaintiff-Appellant stated the following:

> Due to the ongoing nature of the damages, Plaintiff is currently calculating the full amount of the damages. Because they are ongoing, the Plaintiff does not know the full extent of the damage and how far it has reached into Plaintiff's community. The damage to his reputation and business is extensive. Plaintiff estimates that the total damage is in excess of a million dollars, <u>not withstanding punitive and other damages</u>.

Defendants-Appellees thus had notice from the initial disclosures as well. But this is just one of repeated instances in which Plaintiff has put Defendants-Appellees on notice of punitive damages. For example, Plaintiff-Appellant sought information regarding Defendants-Appellees' net worth during discovery. Plaintiff-Appellant submitted a subpoena *duces tecum* to Defendant City Pages, Voice Media Group, and Phoenix New Times ("corporate Defendants") all of which requested: "The net worth of Voice Media Group, Inc. and its subsidiaries, City Pages and Phoenix New Times."

At this point it is indisputable that Defendants-Appellees were on notice regarding punitive damages since this is when Defendants-Appellees filed a motion for a protective order and admitted that Plaintiff-Appellant had pled: "[a]t a later time appropriate time, a prayer for punitive damages will also be pled." Motion for Protective Order (Docket No. 62) at p. 3. Further, these corporate Defendants were questioned during deposition regarding their worth. In the 30(b)(6) deposition of Defendants-Appellees Voice Media Group, Phoenix New Times, and City Pages, the corporate deponent was asked for the total capitalization of these Defendants. *See* Deposition of Van De Voorde (Docket No. 130-4) dated September 22, 2014 at 30:12 – 31:9.

Plaintiff-Appellant further made his intention to seek punitive damages clear in his Motion for Leave to Amend the Complaint (Docket No. 67) dated on September 3, 2014.  Plaintiff-Appellant stated:

> In the Third Amended Complaint, and in the complaints prior to that one, Plaintiff put Defendants on notice in the prayer for relief that he was seeking punitive damages for the intentional and malicious tortious conduct as alleged. Specifically, the Third Amended Complaint stated, "At a later appropriate time, a prayer for punitive damages will also be pled." (Third Amended Complaint at p. 20). This method of pleading is what is required in Florida circuit court cases when pleading punitive damages. In federal court, however, one need only state that punitive damages are sought.

Motion for Leave to Amend the Complaint (Docket No. 67) at p. 1. Thus, Defendants-Appellees had more that the sufficient amount of notice required for Plaintiff to seek punitive damages in this lawsuit.

### D. *Plaintiff-Appellant Attempted to Amend Complaint*

As stated above, Plaintiff-Appellant sought leave of court to amend the complaint twice.  The first attempt was in Plaintiff's Motion for Leave to Amend that was filed on September 3, 2014 (Docket No. 67). Plaintiff-Appellant, desiring to confirm that punitive damages are being sought, stated:

> To eliminate this issue, and in the interest of justice, Plaintiff hereby moves to amend the complaint to simply confirm that he is seeking punitive damages --- even though the Third Amended Complaint sets forth his intention to do so. As discovery has not yet occurred, Defendants are fully on notice of Plaintiff's claim for punitive damages and no prejudice will result by this amendment.

48

Motion for Leave to Amend the Complaint (Docket No. 67) at p. 2.  Nevertheless, the District Court denied Plaintiff-Appellant's motion.

## LEAVE TO AMEND MUST HAVE RESPECTFULLY BE GRANTED IF THIS COURT FINDS THAT PLAINTIFF-APPELLANT HAD NOT YET SUFFICIENTLY PLED FOR PUNITIVE DAMAGES

In the unlikely event that this Court finds that Plaintiff-Appellant had not pled punitive damages, this Court must respectfully remand this case with instructions for the District Court to allow Plaintiff-Appellant amend his complaint to specifically confirm that punitive damages are being sought.  As shown below, under the FRCP, leave to amend should be freely granted and Plaintiff-Appellant made a showing of good cause why amendment should be granted.  Further, Plaintiff-Appellant was simply complying with Florida law and must now be given an opportunity to amend pursuant to the language of the very same law.

### A. *Plaintiff-Appellant Complied With Florida Statute § 768.72*

As stated above, the sole reason that Plaintiff-Appellant pled punitive damages in the manner that was set forth in the complaint was because Plaintiff-Appellant was simply conforming with Florida Statute § 768.72, which prevents Plaintiff-Appellant from pleading punitive damages at the outset when the complaint was filed. *See* Statutory Addendum, page 63.

The Middle District of Florida finds Florida Statute § 768.72 to be substantive and has applied the statute under *Erie* to federal court cases that

49

concern state law causes of action. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). The most detailed analysis comes from this Court's decision in *Neill v. Gulf Stream Coach, Inc.*, 966 F. Supp. 1149 (M.D. Fla. 1997). The Honorable William Terrell Hodges from the Middle District of Florida analyzed whether Section 768.72 conflicted with FRCP 8 and 9. In finding the statute substantive, the court emphasized the lack of any timing requirements under FRCP as well as the comprehensive scheme of Section 768.  Importantly, the District Court began by noting that while FRCP 8 establishes a right to plead generally, there is "no requirement that all claims be plead in the first complaint or that an entitlement to relief will be lost forever if not so plead." *Id*. at 1153.

Accordingly, the Middle District of Florida concluded that the statute and FRCP 8 "are capable of harmonious coexistence." *Id*. at 1154. "If the Plaintiff ultimately makes the required showing [under the Florida statute], the complaint may be amended to add claims for punitive damages that, when made, must simply comport with the requirements of Rule 8." For FRCP 9, the court again emphasized that lack of a timing provision. While FRCP 9 requires that damages be specifically plead, " . . . the lack of a timing provision in Rule 9(g) read in light of the liberal amendment provisions of Rule 15 compels the conclusion that Rule 9(g) and § 768.72 'can exist side by side . . . each controlling its own intended

50

sphere of coverage without conflict.'" *Id*. (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980)).

Importantly, the District Court had already held Statute § 768.72 applicable in this lawsuit as well. Magistrate Philip Lammens, in his Order of September 19, 2014 similarly applied Florida Statute § 768.72 to this case, holding: "Unless and until Plaintiff pleads a claim for punitive damages, it would be premature to allow discovery on net worth. Indeed, §768.72(1) specifically provides that "[n]o discovery of financial worth shall proceed until after the pleading concerning punitive damages is permitted."

As noted above, Statute § 768.72 gives Plaintiff-Appellant the opportunity to later amend the complaint specifically for the reason of asserting a claim for punitive damages. The statute states: "[t]he claimant may move to amend her or his complaint to assert a claim for punitive damages as allowed by the rules of civil procedure.  Plaintiff-Appellant thus has a substantive right to amend his complaint.

Since this case is in federal court, the Federal Rules of Civil Procedure would govern the amending of Plaintiff-Appellant's complaint.  There are two applicable rules providing for the amending of a complaint under FRCP, Rule 15(a)(2) and Rule 16(b).

Given that Statute § 768.72 specifically allows Plaintiff-Appellant a right to later amend his complaint specifically for the reason of adding a claim for punitive

damages, FRCP 15(a)(2) is the most applicable rule for revision in this circumstance. This was the same provision Judge Hodges utilized to allow for the amending of the complaint in *Neil*, 966 F. Supp. at 1154, *supra*. FRCP 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave [and] [t]he court should freely give leave when justice so requires." *See Richardson v. United States*, 193 F.3d 545, 548-49 (D.C. Cir. 1999) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("Leave to amend a complaint should be freely given . . . ."). In the event that "a party's motion to amend is [found to have been] filed after the deadline . . . , the party must show good cause why leave to amend the complaint should be granted." *See Smith v. School Bd. Of Orange County*, 487 F.3d 1361, 1366 (11th Cir. 2007).

In *Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001), this Court held that a district court's discretion to deny amending a complaint is "'severely restrict[ed]' by Fed. Rule Civ. P. 15(a), which directs that leave to amend 'shall be freely given when justice so requires.'" *Id*. at 1163 (*quoting Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988) (citation omitted). "[U]nless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Shipner v. Eastern Airlines, Inc.*, 868 F.2d 401, 406 (11th Cir. 1999). This Court has held the following with respect to Rule 15(a):

> The decision whether to grant leave to amend is committed to the sound discretion of the trial court. *Best Canvas Products & Supplies, Inc. v.*

52

> *Ploof Truck Lines, Inc.*, 713 F.2d 618 (11th Cir. 1993). However,
> "'[d]iscretion' may be a misleading term, for rule 15(a) severely restricts
> the judge's freedom, directing that leave to amend 'shall be freely given
> when justice so requires.'" *Dussouy v. Gulf Coast Investment Corp.*, 660
> F.2d 594, 597 (5th Cir. 1991). This policy of Rule 15(a) in liberally
> permitting amendments to facilitate determination of claims on the merits
> circumscribes the exercise of the trial court's discretion; thus, "[u]nless
> there is a substantial reason to deny leave to amend, the discretion of the
> district court is not broad enough to permit denial." *Id*. at 598.

*Espey v. Wainwright*, 734 F.2d 748, 750 (11th Cir. 1994) (emphasis added).

"District Courts have only limited discretion to deny a party leave to amend the

pleading. Thus, the court is constrained to allow a plaintiff leave to amend unless

there are substantial contravailing reasons." *Grayson v. Kmart Corp*., 79 F.3d

1096, 1110 (11th Cir. 1996).

    FRCP allows a complaint to be amended at nearly any time during a lawsuit,

even after the conclusion of a trial. *See Southern Coast Corp. v. Sinclair Refining*

*Co.*, 181 F.2d 960 (5th Cir. 1950) (reversing and remanding with instructions for

the District Court to allow for the amending of the complaint even after "the

winnowing process of a trial in the court below"); *Valero Mktg. & Supply Co. v.*

*Southcap Pipe Line Co.*, 2010 U.S. Dist. LEXIS 103875, 1-2 (S.D. Ill. Sept. 2010)

("After the close of evidence, Petitioners filed a motion to amend the complaint to

conform to the evidence adduced at trial (Doc. 182), which the Court granted.");

*Jacobs v. Central Transport, Inc.,* 891 F. Supp. 1088, 1093-94 (E.D.N.C. 1995)

(granting plaintiff's motion to amend the complaint to conform to the evidence made after the close of evidence at trial but before judgment was rendered).

Plaintiff-Appellant moved for leave of court *twice* to amend the complaint in order to add a claim for punitive damages. *See* Docket Nos. 67 and 110. Each time, the District Court denied Plaintiff-Appellant's motion and rejected the amended complaint.

The District Court erroneously held that since the Case Management and Scheduling Order (Doc. No. 36) set a previous deadline for amending a complaint, and that since the deadline had already passed, that Plaintiff was now subject to Rule 16(b) Under FRCP 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent." "[The] good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (citations omitted). The Court considers three factors when deciding diligence: (1) if the moving party neglected to determine facts before filing pleadings or within discovery, (2) if the subject matter of the motion to amend was readily available to the moving party, and (3) if the moving party delayed filing the motion to amend. *Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1277 (M.D. Fla. 2002).

The District Court's reasoning in denying the motion to amend was wrong for at least two reasons.  First, Plaintiff-Appellant was unable to amend the complaint to add a prayer for punitive damages until such time that a "reasonable basis" could be shown for including such damages.  Specifically, it was only after Plaintiff-Appellant received the final discovery documents from Defendants-Appellees that it was appropriate for Plaintiff to make a full showing of a "reasonable basis" to include punitive damages. Since Plaintiff-Appellant was unable to make this showing without discovery, Plaintiff-Appellant must now be given the opportunity to amend the complaint, pursuant to Statute § 768.72, regardless of whether it occurs after the initial deadline for amending a complaint that was set forth in the District Court's Case Management Order. Given Florida Statute § 768.72's mandate that Plaintiff be given the opportunity to amend a complaint for the reason of adding a prayer for punitive damages, it only follows that amendment is proper under FRCP Rule 15 simply because Florida law is independent of the District Court's Case Management and Scheduling Order. There is no deadline set in Florida Statute § 768.72 and thus no deadline should be applied to Plaintiff-Appellant.

Second, even if FRCP Rule 16(b) would be applicable, which it should not, Plaintiff-Appellant must still be given the opportunity to amend and this particularly turns on Plaintiff-Appellant makes a showing of "good cause."  The

District Court's Order of December 8, 2014 incorrectly suggests that Plaintiff-Appellant has not made a showing of good cause sufficient to amend the complaint to include a prayer for punitive damages.[5]  In so finding, the District Court respectfully erred as a matter of fact and law for the following reasons: (1) Plaintiff-Appellant did not discover the blog posting of Defendant Ken Avidor until after the initial deadline of December 12, 2013 to amend the complaint; (2) the law is clear that complaints are routinely amended after discovery closes, particularly since new information usually comes to light during the discovery period.  This was the case in this instance; (4) the law is also clear that complaints can be amended even after the close of evidence at trial. *See Valero Mktg. & Supply Co. v. Southcap Pipe Line Co.*, 2010 U.S. Dist. LEXIS 103875.

The District Court relied on this Court's opinion in *Smith v. School Bd. of Orange Cnty.*, 487 F.3d 1361, 1366, (11th Cir. 2007), and ruled that Plaintiff had not acted diligently in moving to amend his complaint. *See* Order of December 8, 2014 at pp. 3-4.  The District Court failed to take into account Florida Statute § 768.72, that requires Plaintiff-Appellant not include a claim for punitive damages until such time that there is "a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of

---

[5] The District Court stated: "the Court is convinced that Plaintiff has (again) not shown good cause to justify amending his pleadings."  Order of December 8, 2014 (Docket No. 110) at p. 4.

such damages." Florida Statute § 768.72.  In order to establish "evidence on the record" Plaintiff-Appellant first needed to await all potential evidence produced by Defendants-Appellees during discovery.  This is especially true since Defendants-Appellees did not release documents sought in Plaintiff-Appellant's document request on the last day for discovery to close, September 22, 2014.  In fact it was on this very last day of discovery, September 22, 2014, that Defendants-Appellees produced the blog posting of Defendant-Appellee Ken Avidor wherein he maliciously defamed Plaintiff-Appellant. The document was crucial because not only was it linked to the article of Defendant-Appellee Rupar which contained the headline "Bradlee Dean's Lawyer Larry Klayman: Allegations of Sexual Abuse to Children" and which later in the posting told readers that Plaintiff had committed a crime when he did not, but it also equated Plaintiff-Appellant with infamous pedophiles who had been convicted of crimes, such as the perverted school teacher who fed his students semen, and Jerry Sandusky, the Pennsylvania State football coach who is a convicted child molester. This new found discovery can be a showing of good cause.  *See Salgado v. Land O' Lakes, Inc.,* 2014 U.S. Dist. LEXIS 128242 (E.D. Cal. Sept. 12, 2014)(granting plaintiff's motion to amend and finding that good cause was satisfied under Rule 16 when Plaintiff-Appellant represented that the facts giving rise to the new claims were discovered as a result of the documents uncovered during discovery disputes).

Stated simply, the blog posting of Defendant-Appellee Avidor proved proof of maliciousness on the part of the Defendants-Appellees and was the "reasonable basis" needed for Plaintiff-Appellant to plead punitive damages.  Thus, Plaintiff-Appellant acted as diligently as was possible while following Florida Statute § 768.72. Plaintiff-Appellant moved to amend his compliant well before the trial in this case, which is scheduled to being April 1, 2015.  Further, there was no prejudice to the opposing party since the Defendants-Appellees were on notice from the beginning of the lawsuit that Plaintiff-Appellant would be seeking punitive damages at a later time.

Finally, Florida Statute § 768.72 should be "good cause" for the amending of a complaint by itself. Plaintiff-Appellant was bound to follow Florida Statute § 768.72 which is why he did not initially include a prayer for punitive damages. That he was amending the complaint to continue compliance with Florida law is more than sufficient to satisfy a good cause standard.

Plaintiff-Appellant had thus shown good cause to amend the Complaint as he had properly pled punitive damages under Florida Statute § 768.72 and subsequently had compelling information from the blog posting of Ken Avidor – obtained during discovery which did not close under the Case Management and Scheduling Order until September 22, 2013 – that a prayer for punitive damages was clearly warranted.

58

Accordingly, amendment of the Complaint was proper under FRCP 15(a) and 16(b) and the District Court erred in not allowing Plaintiff-Appellant to amend his Complaint.

## **CONCLUSION**

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Court reverse and remand the decision of the U.S. District Court for the Middle District of Florida and vacate all District Court Orders, as the trial judge should have recused herself from the case once her bias and prejudice manifested itself. The District Court clearly erred in determining that Plaintiff-Appellant did not show constitutional malice. Plaintiff-Appellant had demonstrated with circumstantial evidence that Defendants-Appellees were knowingly making false and defamatory statements or making them with reckless disregard for the truth. Granting summary judgment was improper because it was for the jury to determine whether constitutional malice was present. *See*, *e.g.*, *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) ("Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.").

Respectfully submitted,


*/s/ Larry Klayman*
Larry Klayman
Florida Bar No. 246220
2775 NW 49th Ave., Suite 205-346
Ocala, FL 34483
(310) 595-0800
Email: leklayman@gmail.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

*/s/ Larry Klayman*
Larry Klayman, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of August, 2015, a true and

correct copy of the foregoing with the United States Court of Appeals for the

Eleventh Circuit and was served via Appellate CM/ECF to the following:

**Sanford Lewis Bohrer**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
305/374-8500
Fax: 305/789-7799
Email: sbohrer@hklaw.com

**Scott D. Ponce**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
305/789-7575
Email: sponce@hklaw.com

*Attorneys for Defendants*

/s/ Larry Klayman
Larry Klayman, Esq.

62

## STATUTORY ADDENDUM

Florida Statute § 768.72 provides:

**768.72    Pleading in civil actions; claim for punitive damages.**—

(1)    In any civil action, no claim for punitive damages shall be permitted unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages. The claimant may move to amend her or his complaint to assert a claim for punitive damages as allowed by the rules of civil procedure. The rules of civil procedure shall be liberally construed so as to allow the claimant discovery of evidence which appears reasonably calculated to lead to admissible evidence on the issue of punitive damages. No discovery of financial worth shall proceed until after the pleading concerning punitive damages is permitted.