No. 15-12731-G

IN THE
**UNITED STATES COURT OF APPEALS**
FOR THE
**ELEVENTH CIRCUIT**
_____

LARRY KLAYMAN,
*Plaintiff-Appellant*

*v.*

CITY PAGES, ET. AL.,
*Defendants-Appellees*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

(CASE NO: 5:13-CV-00143-ACC-PRL)

_____

**PLAINTIFF-APPELLANT'S REPLY BRIEF**
_____

LARRY KLAYMAN
2775 NW 49th Ave., Suite 205-346
Ocala, FL 34483
(310) 595-0800
Email: leklayman@gmail.com

*Plaintiff-Appellant*

DATED: December 28, 2015

# **TABLE OF CONTENTS**

SUMMARY OF THE ARGUMENT……………………………………..…..1

ARGUMENT………………………………………………………………....4

CONCLUSION………………………………………………………...24

CERTIFICATE OF COMPLIANCE………………………………………..25

CERTIFICATE OF SERVICE…………………………………………………26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Dimick v. Schiedt*, 293 U.S. 474 (1935)...................................................................12

*Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249 (9th Cir. 1997) ............................5

*\*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ....................................................4

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969) ........................................ 6, 11

*Guam Fed'n of Teachers v. Ysrael,* 492 F.2d 438 (9th Cir. 1974)............................6

*In re Chevron U.S.A.,* 121 F.3d 163 (5th Cir. Tex. 1997) .......................................18

*\*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008) ....................................15

*Khawar v. Globe Int'l, Inc.*, 965 P.2d 696 (Cal. 1998) ..............................................8

*Kloepfer v. Commission on Jud. Conduct*, 782 P.2d 239 (Cal. 1989) ....................21

*Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984) .................6

*McCullough v. Commission on Jud. Perf.*, 776 P.2d 259 (Cal. 1989)....................21

*Mile Marker, Inc. v. Petersen Publishing, LLC*, 811 So.2d 841(Fla. 4th DCA 2002)
............................................................................................................................4

*Newton v. National Broadcasting Co.,* 930 F.2d 662 (9th Cir. 1990) ......................9

*Roberts v. Ace Hardware, Inc.*, 515 F. Supp. 29 (N.D. Ohio 1981).......................20

*Ryan v. Brooks*, 634 F.2d 726  (4th Cir. 1980) ..........................................................4

*Sprague v. Walter*, 656 A.2d 890 (Pa. Super. Ct. 1995)...........................................8

*St. Amant v. Thompson*, 390 U.S. 727 (1968)................................................... 4, 8, 9

*State ex. rel. Strain v. Foster*, 537 P.2d 547 (Ore. 1975) ........................................20

*United States v. Antar*, 53 F.3d 568 (3d Cir. N.J. 1995)..........................................19

## SUMMARY OF THE ARGUMENT

Defendants-Appellees, Matthew Hendley, Kenneth Avidor, and Aaron Rupar, as well as publishers City Pages and Phoenix New Times, and Voice Media Group ("Appellees") had knowledge or were at least reckless with regard to the falsity of the statements when they made them, and are now conveniently claiming it was simply a mistake. This is not the case, however. Appellees acted specifically with the intent to harm and/or with recklessness with regard to Appellant by making defamatory statements that they knew or should have known were misleading and false.

Appellees had reasons to despise Plaintiff-Appellant Larry Klayman ("Appellant"). Appellant was representing Sheriff Joseph Arpaio of Maricopa County, Arizona. It is widely known that Sheriff Arpaio is tough on illegal aliens, as he has gained national attention for making inmates wear pink underwear and having them live in "tent cities" instead of releasing them early when the prisons are at capacity. Appellee Hendley, who resides under the jurisdiction of Sheriff Arpaio, had been previously arrested for drugs and for assaulting a police officer. (Appendix Volume ("App. Vol.") IV, Docket No. 104-4) at 8:14-18 ("Question: Have you ever been convicted of a crime? Answer: Yes. Question: And what was that? One was criminal damage; the other was aggravated assault on a police officer."). As such, when the opportunity arose for Appellee Hendley to harm

1

somebody associated with Sheriff Arpaio in order to harm Apaio himself,

specifically his lawyer, Appellee Hendley took it. Sheriff Apraio had to be taken

down, and Appellant was the "whipping boy" that Appellee could take out his

anger on. Appellee admitted to reading over The Florida Bar reprimand and indeed

has access to the entire Florida Bar file, and yet he still published the false and

defamatory statements about Appellant. Hendley Depo. (App. Vol. IV, Docket No.

104-4) at 67:8-10 ("Q. Have you ever reviewed any documents from the Florida

Bar concerning me? A. Yes.").

The record shows that Appellant demonstrated, with direct and a great deal

of circumstantial evidence, that Appellees had acted with constitutional malice.

This standard requires Appellant to demonstrate that Appellees had knowledge of

the falsity of the statements, or published them with reckless disregard for the

truth.  Nothing shows that this standard has been met more than the fact that

Appellees admitted to having reviewed relevant documents pertaining to Appellant

before writing false and defamatory statements about Appellant using those very

same documents. Appellant more than satisfied the required standard, and this case

should have been allowed to go to a jury to decide.

Further, as set forth in Appellant's initial brief, at the very minimum,

Appellees defamed Appellant by implication by omitting material evidence

available and misstating facts on the public record that proved Appellant was

cleared of all the false allegations that were made against him. This, nevertheless, was not beneficial to the story that Appellees wanted to tell, and thus it was purposely not included in the defamatory articles. Further, Appellees juxtaposed and made reference to Appellant with stories of a teacher charged with 52 counts of child sex abuse, as well as former Pennsylvania State football coach, Jerry Sandusky, a convicted serial child molester, in order to portray him as the same type of pervert. (App. Vol. IV, Docket No. 104-9).

However, as is likely given that the U.S. District Court for the Middle District of Florida ("District Court") judge demonstrated bias and prejudice toward Appellant, this case was wrongfully taken out of the hands of the jury and instead decided wrongfully on summary judgment. The bias and prejudice of the District Court judge manifested itself in the Order granting summary judgment, and must be seen as evidence of the bias and prejudice. Indeed, as evidence in the Order granting summary judgment, Appellant was mocked and insulted by the District Court judge as a "moron" and a "criminal." This conduct is unbefitting of a federal judge, who was required by her rules of ethics not to make this case personal and attack Appellant apparently because she took a dislike to him.

Given the foregoing reasons, this Court should respectfully reverse the ruling of the District Court and remand this case with instructions that a new District Court judge should be assigned to the case.

3

## ARGUMENT

### A. Appellant Made a Showing of Constitutional Malice

Appellant made the requisite showing of constitutional malice that should have had this case taken to a jury. Appellant stipulated for purposes of this litigation public figure, requiring the defendant to have published the statements with actual knowledge of their falsity **or with reckless disregard of the truth**. *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-43 (1974); *Mile Marker, Inc. v. Petersen Publishing, LLC*, 811 So.2d 841, 845 (Fla. 4th DCA 2002).

"Reckless disregard,' " Justice White noted in *St. Amant*, "cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication." *Ryan v. Brooks*, 634 F.2d 726, 732 (4th Cir. 1980) (citing *St. Amant v. Thompson*, 390 U.S. 727,730 (1968).

The District Court stated the following in its Order of April 3, 2015:

> Hendley's declaration of truth is not sufficient to automatically insure a favorable verdict, the Court finds Hendley's actions (while likely negligent), when also considering the minimal evidence discussed above, still fails to establish sufficient evidence to meet the clear and convincing standard as to Plaintiff's claims on June 18 Article.

Order (App. Vol. IV, Docket No. 124) at p. 31. **Appellee Hendley admitted that he reviewed the filings in The Florida Bar proceedings**, which were linked in the *Miami New Times* article. Hendley Depo. at 72:6 - 73:7; ("Q. And in those

4

documents, were you just simply looking at the New Times article, or did you

actually get documents from my Florida Bar file after you -- after it was called to

your attention by the Miami New Times?  **A. That article had links to Florida**

**Bar documents, and those are the documents I looked at.**") 83:3 - 84:6 ("**Q. BY**

**MR. KLAYMAN: But you did testify you reviewed the documents on the**

**link? A. Yes**. Q. And you made no effort to investigate these mitigating

circumstances before writing your article, which is Plaintiff's Exhibit 3. Correct?

**A. I investigated it to the extent of reviewing documents related to the case.**").

　　　With regard to Appellee Matthew Henley, an issue comes down to whether

he made a mistake in reporting Appellant's Florida Bar Reprimand, or whether he

knowingly made the false statements or omitted key facts in order to harm

Appellant.

　　　State and federal courts have undoubtedly recognized that "it would . . . be

rare for a defendant . . . to admit to having had serious, unresolved doubts . . .

<u>Requiring proof of recklessness "without being able to adduce proof of the</u>

<u>underlying facts from which a jury could infer recklessness . . . would limit</u>

<u>successful suits to those cases in which there is direct proof by a party's admission</u>

<u>of the ultimate fact.</u>" *Eastwood v. Nat'l Enquirer, Inc*., 123 F.3d 1249, 1253 (9th

Cir. 1997) (emphasis added) ("As we have yet to see a defendant who admits to

entertaining serious subjective doubt about the authenticity of an article it

published, <u>we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives</u>."); *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984) ("The plaintiff need not obtain any admission of fault from the defendant."), *vacated on other grounds,* 477 U.S. 242 (1986); *Goldwater v. Ginzburg***,** 414 F.2d 324, 343 (2d Cir. 1969). If this were not the law, "mere swearing could, as a matter of law, defeat any action to which the *New York Times* principles are applicable." *Guam Fed'n of Teachers v. Ysrael,* 492 F.2d 438, 439 (9th Cir. 1974), *cert. denied,* 419 U.S. 872 (1974). This is precisely the case here.  Appellee Hendley reviewed The Florida Bar reprimand, admitted that he reviewed the underlying documents in the entire file, and still made an "error" in reporting.  Hendley Depo. (App. Vol. IV, Docket No. 104-4) at 67:8-10 (*"*Q. Have you ever reviewed any documents from the Florida Bar concerning me? A. Yes.").

The Court cannot simply rely on Appellee Hendley's assertions that he made a mistake, especially where, as here, he would have a reason to harm Appellant's reputation, namely as a means of harming Sheriff Arpaio. An even if a mistake was made, it was still reckless from all of the evidence in the record. Hence, whether Appellee genuinely made a mistake or whether he made it with constitutional malice should not have been a decision for the District Court to have made, but rather should have been left for a jury to decide.

6

The same was also true with regard to The Florida Bar's reprimand. As made clear in the public consent judgment which was at Appellees' disposal, which Appellees admitted to reviewing. Hendley Depo. (App. Vol. IV, Docket No. 104-4) at 67:8-10 (*"Q. Have you ever reviewed any documents from the Florida Bar concerning me? A. Yes."*).  Appellant had entered into a settlement agreement with a former client, Natalia Humm, wherein Appellant agreed to pay $5,000 out of a $25,000 non-refundable retainer, at the urging of a Florida Bar mediator to amicably resolve this matter and to put the matter behind him. Klayman Affidavit (App. Vol. IV, Docket No. 104-1) ¶5. Appellant had made ongoing installment payments to the former client, and there was not much left that remained to be paid. *Id.*  However, the bar filed a complaint after its letter, which could have averted the complaint, could not reach Appellant due to changes of address and the subsequent confusion this caused. *Id.* The complaint was only filed after Appellant inadvertently did not timely respond. *Id.*

Importantly, as set forth in the public consent judgment, the lawyer who succeeded Appellant in the representation of the client, who was prepared to testify had this case not been dismissed by the District Court, admitted to Appellant that he did not owe the client a refund and that he did not expect Appellant to make payment. Klayman Affidavit (App. Vol. IV, Docket No. 104-1) ¶5.  Humm's subsequent attorney, Mark Solomon, stated "[i]t is unlikely that (you) would want

7

to refund a cent so please provide me with an explanation so that I may pass it along to Ms. Humm." *Id.*

The entirety of this record was available on the public record, and Appellees admitted to having reviewed it. Appellees did not make a mistake. They made a calculated and/or reckless effort to harm Appellant regardless of what the facts actually were.

### B. It Was the Responsibility of a Jury to Make a Finding of Whether Constitutional Malice Existed

Following U.S. Supreme Court precedent, relying on circumstantial evidence to prove constitutional malice has become the proper method throughout the country. *See*, *e.g.*, *Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 709 (Cal. 1998) ("To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including evidence of motive and failure to adhere to professional standards."); *Sprague v. Walter*, 656 A.2d 890, 907 (Pa. Super. Ct. 1995) ("Any competent evidence can be used to establish actual malice.").

Constitutional malice be evidenced by objective data and proof of common law malice. *St. Amant v. Thompson*, 390 U.S. 727 (1968). In *St. Amant*, the U.S. Supreme Court held that there need only be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." The U.S. Supreme Court continued by

8

holding that it was the responsibility of the finder of fact, in this case a jury, to

determine whether that constitutional malice existed:

> The finder of fact must determine whether the publication was indeed
> made in good faith. Professions of good faith will be unlikely to prove
> persuasive, for example, where a story is fabricated by the defendant,
> is the product of his imagination, or is based wholly on an unverified
> anonymous telephone call. Nor will they be likely to prevail when the
> publisher's allegations are so inherently improbable that only a
> reckless man would have put them in circulation. Likewise,
> recklessness may be found where there are obvious reasons to doubt
> the veracity of the informant or the accuracy of his reports.

*St. Amant v. Thompson*, 390 U.S. at 732.

Recognizing the role of the jury in determining constitutional malice, the

U.S. Court of Appeals for the Ninth Circuit has held:

> We must attempt to discharge our constitutional responsibility to
> protect First Amendment values without unduly trenching on the fact-
> finding role of the jury and trial judge. We are mindful that in *New
> York Times, Bose*, and *Harte-Hanks*, the Supreme Court was
> fashioning a process for reviewing the evidence which permits
> judicial protection of First Amendment values while still paying due
> deference to the fact-finding role of juries, and particularly the jury's
> opportunity to observe the demeanor of the witnesses.

*Newton v. National Broadcasting Co.,* 930 F.2d 662, 672 (9th Cir. 1990).

As forth in Appellant's initial brief, there were multiple categories of

circumstantial evidence that were presented by Appellant that could have been

used by a jury to find constitutional malice on the part of Appellees. *See*

Appellant's Initial Brief at pp. 28-40. First, there is evidence of actual malice

because Appellees ignored Plaintiff's letter demanding a correction to the articles.

(App. Vol. I, Docket No. 14-3). Second, Appellees' editorial practices demonstrate that the articles in question were not works of journalism but were rather simply "hit pieces" on Appellant designed to harm him and his reputation.  Third, actual malice can be shown because Appellee Hendley was previously convicted of crimes and used drugs and thus had a motive for harming Appellant, who was the attorney for Sheriff Joseph Arpaio. (App. Vol. IV, Docket No. 104-4) at 8:14-18 ("Question: Have you ever been convicted of a crime? Answer: Yes. Question: And what was that? One was criminal damage; the other was aggravated assault on a police officer."). Fourth, Appellees did not contact Appellant before publishing the articles. Hendley Depo. (App. Vol. IV, Docket No. 104-4) at 129:12-21; Rupar Depo. (App. Vol. III, Docket No. 104-3) at 85:17-20 ("Q. In fact, you never bothered to get a comment from me about this article before you published it, did you? A. I did not.").

Fifth, the malicious blog post of Appellee Ken Avidor linked Appellant containing a statement about a teacher who was accused of feeding semen to his students, as well as to Pennsylvania State football coach Jerry Sandusky, a convicted serial child molester. (App. Vol. IV, Docket No. 104-9). Avidor brought his blog post to Rupar's attention "which was then maliciously linked" to Avidor's blog. Sixth, Avidor and Rupar sought to sell Avidor's "malicious book" featuring "a computer doctored photo maliciously designed to make [Michele] Bachmann

10

look like a deranged lunatic." (App. Vol. IV, Docket Nos. 104-9; 104-12). Seventh, the title of and the language used in the article is itself evidence of actual malice. (App. Vol. IV, Docket No. 104-10). Finally, Appellees conceded that the statement in the June 18 Article is false (Vol II, Doc. No. 94 at p. 15); indeed, the statement— "Klayman's been in trouble with a Bar association before, as he was publicly reprimanded by the Florida Bar in 2011 for taking money from a client, and never doing any work"—is not accurate and in fact false.

On point is *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969).  In *Goldwater*, the defendant falsely published that Senator Barry Goldwater, a public figure and presidential candidate, was suffering from paranoia and was mentally ill. In this case, the U.S. Court of Appeals for the Second Circuit found that the Appellees "were very much aware of the possible resulting harm" and that "the seriousness of the charges called for a thorough investigation but the evidence reveals only the careless utilization of slipshod and sketchy investigative techniques." *Id*. at 339.  In confirming the jury's funding of liability, the Court held that, "[t]here is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity."

Thus, for the District Court to hold that Appellant had only shown ill will and not constitutional malice is error.  It is specifically the finding of ill will

11

through the use of circumstantial evidence that will lead a plaintiff to demonstrate that a defendant published false statements either knowingly or with reckless disregard for the truth.

Given the amount of circumstantial evidence that was submitted by Appellant, a jury could have found, and indeed mostly would have found, that constitutional malice existed. *See*, *e.g.*, *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) ("Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.").

## C. Linked Webpages Reincorporated the Defamatory Content

Appellee Avidor's defamatory blog posting (App. Vol. IV, Docket No. 104-9) was linked and incorporated into the blogs by Appellees Rupar and Hendley. Appellees claim that Avidor was properly granted summary judgment since he was not responsible for the publishing of any of the articles. This, however, is false. The articles at issue in this lawsuit were a collaborative and incorporated effort and must be viewed as a whole. Appellees are liable for the linked statements made in their postings, including those made by and cannot immunize themselves from their tortious conduct. Indeed, Appellees linked, republished, and reincorporated Appellee Rupar's blog posting, and cannot escape liability for it.

12

Web pages that link to defamatory content are not immune from tortious

content.  If a web site changes objectionable third-party postings materially or

mixes them with their own, it may itself become a "content provider" and lose

immunity. To do this, the web site or provider need only make edits that go

"beyond the traditional publisher's role" as when the provider "takes an active role

in creating or developing the content at issue." *Fair Hous. Council v.*

*Roommates.com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008) citing *MCW, Inc. v.*

*Badbusinessbureau.com, LLC,* 2004 U.S. Dist. LEXIS 6678, No. 3:02-CV-2727-G

at *26 (N.D. Tex. April 19, 2004). In *Fair Hous. Council v. Roommates.com*, the

U.S. Court of Appeals for the Ninth Circuit found that the defendants were liable

for violating the Fair Housing Act by publishing discriminatory statements made

by its users. *Id*.  The Court considered whether immunity should be granted since

defendants were simply linking to user profiles, and rejected that argument. The

Court held that since the defendants were taking an active role in creating the

content, then they were no longer immune. *Id*.

This is precisely what happened here.  Appellee Avidor's blog, titled

"Bradlee Dean's Lawyer Larry Klayman: Allegations of Sexual Abuse to

Children," quotes Bradlee Dean's statement about a teacher who was accused of

feeding semen to his students. (App. Vol. IV, Docket No. 104-9). This teacher was

charged with "52 counts of child sex abuse."  There is also mention of former

13

Pennsylvania State football coach, Jerry Sandusky, a convicted serial child molester. *Id.* Appellant was mentioned right after this teacher in order to create the false impression that Appellant also committed acts of child sexual abuse. *Id.* There is only one reason why these two perverts are mentioned in this blog post: in order to falsely make the point that Appellant and these perverts are one and the same and thus smear and libel Appellant by direct association.

Appellee Rupar linked and incorporated the defamatory statements from Appellee Avidor.  He wrote:

> A court recently ordered Klayman to pay his ex-wife $325,000 in attorney fees. Klayman appealed, but a judge tossed it out. What's interesting, however, are a couple nuggets buried in the judge's ruling (via Ken Avidor -- emphasis his):

(App. Vol. IV, Docket No. 104-10) (hyperlink in original).  The article then went on to quote portions of Avidor's blog posting, which only selected small portions of the Court of Appeals of Ohio's ruling, and even identified these portions as having come from Avidor's blog by having them published in a different colored background. *Id.*  Avidor's blog post was then *literally* reincorporated into Rupar's defamatory article because it was in large part copied and pasted into it. *Id.* These actions went beyond simply posting a link and instead materially mixed Avidor's blog into Rupar's own defamatory article.  Rupar added his own commentary to Avidor's blog posting, stating "Turns out, gays aren't the only ones capable of disturbing, criminal sexual behavior -- apparently even conservative straight guys

14

tight with Bradlee Dean can turn out to be total creeps." (App. Vol. IV, Docket No. 104-10).  For this reason, Avidor's blog must be considered a part of Rupar's article and Avidor must be held accountable for the tortious conduct that he partook in.  The blog post and the article were mixed together to become an inseparable single tortious article.

Further, Avidor, in his linked blog posting, pushes readers to other articles about Appellant, Dean, and Bachman such as: "Court Ordered Bradlee Dean to Pay $24,695.23 Defendants Attorneys Fees"; "Larry Klayman Wants Bradlee Dean v. NBC, Rachel Maddow to Go to Trial to Defend Michele Bachmann"; "Bachmann's BFF Larry Klayman is Flat Broke"; "Larry Klayman. Bradlee Dean's Lawyer Appeared With Michele Bachmann at Presser in Support of Terrorist Group." (App. Vol. IV, Docket No. 104-9). Each of these articles demonstrates Appellees intent, and perhaps obsession, with harming Appellant by continuously writing damaging articles about him.

As set forth in Appellant's initial brief, at the very minimum, these actions by Avidor and Rupar created the tort of defamation by implication.  *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) ("Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts . . ."

15

Appellees committed both forms of defamation by implication. It is true that the teacher was charged with sexually abusing children.  It is also true that the Ohio Court of Appeals released a ruling in a *civil* lawsuit regarding Appellant. However, to place them together in the manner that Appellee Avidor did is done specifically in order to imply a defamatory connection between Appellant and the pervert teacher. Quite simply, **Appellees put these two statements together to make the readers believe that Appellant was the same as an alleged criminal with 52 charges against him, as well as with Sandusky, a convicted serial child molester, when in fact there have never been any criminal charges brought against Plaintiff**. (App. Vol. IV, Docket No. 104-9). However, this was the impression that Appellees wanted to create, even though they knew it was false or they wanted to believe it was true so badly that they acted with reckless disregard for the truth. For this reason, Appellees committed defamation by implication.

By titling the column as he did by referencing now dismissed child sexual abuse allegations concerning the Appellant, false charges that were long since disposed of, and equating and associating Appellant Klayman with the convicted school teacher who fed semen to his students and committed other perverted acts as well as the Penn State football coach Jerry Sandusky, both Appellees Avidor and Rupar are maliciously defaming Appellant Klayman and making him out to be a sick pervert. (App. Vol. IV, Docket No. 104-9).

16

Further, both Appellee Avidor and Rupar quote a selected portion of the Ohio Court of Appeals' ruling, which they use to maintain falsely that Appellant Klayman was found to have sexually abused his children. (App. Vol. IV, Docket No. 104-15). However, Appellees omit any reference to the record that Appellant was not charged with any crimes and he was not found to have sexually abused his children. *Id.* Appellees further omit the fact that this is not a criminal lawsuit but is only a civil matter relating to the custody of Plaintiff's children.  *Id*. By omitting the fact that this was a civil lawsuit, and not a criminal lawsuit, Appellee implies that Appellant was found to have committed crimes of child sexual abuse by a criminal court, since a criminal court is ordinarily where such a matter would be taken. But, Appellant was never found to have committed any crime, sexual or otherwise. (App. Vol. IV, Docket Nos. 104-14; 104-15).

**Importantly, the entirety of the evidence clearing Appellant of all charges was part of the public court record.** Appellant was cleared of these false charges by the Cleveland Department of Children and Families, the Cuyahoga County Sheriff's Department, and the District Attorney, all of whom dismissed these false and unsubstantiated allegations made by Appellant's ex-wife during a highly contested custody proceeding (Vol IV, Docket Nos. 104-1; 104-10; and 104-11).  Further, Appellant voluntarily took and passed a polygraph examination, evidencing that Appellant did not sexually abuse his own children (App. Vol. IV,

Docket No. 104-13). Appellees chose to ignore this portion of the public record simply to create the false impression that Appellant had actually committed the heinous acts that he was accused of.  In reality, the truth was already on the public record that Appellant had done no such thing. Specifically, neither the magistrate's decision nor the Ohio appellate court ever state that Plaintiff had committed any sexual abuse. (App. Vol. IV, Docket Nos. 104-14; 104-15).  However, this was not the story that the Appellees wanted to tell.  They had the malicious intent to harm Appellant and omitted whatever part of the record that they wanted to in order to create the story that they wanted to tell.

**D. District Court's Bias and Prejudice Was Shown in the Court's Order**

The District Courts' Order manifested the extra-judicial bias and prejudice toward Plaintiff.  The District Court believed it was appropriate to write quotes about "Moron[s]" and "Murder[ers]" in its Order granting summary judgment in favor of Appellees. The District Court acted in the same manner as the Appellees and ridiculed Appellant via a Lewis Carroll *fictional novel* titled "Alice In Wonderland." The District Court uses its disrespectful and offensive Alice in Wonderland analogies to reveal its disdain for and extrajudicial bias and prejudice against Appellant.  This language is unbecoming of a federal court judge who, under her oath of office, is to administer the laws, not berate and demeanor litigants.

Extra-judicial bias and prejudice can manifest itself in statements made in the course of litigation. On point is *In re Chevron U.S.A.,* 121 F.3d 163, 166-167 (5th Cir. Tex. 1997). In *In re Chevron*, the U.S. Court of Appeals for the Fifth Circuit considered the trial judge's disqualification based upon several racially insensitive statements made by the judge which petitioner viewed as demonstrating the judge's personal bias or prejudice or which created the appearance thereof, despite counsels' assurances that the statements were made in jest or made sarcastically. The Court held:

> While one may argue to the contrary, we must conclude that a reasonable person could believe that some of the judge's rulings might be impacted by beliefs or feelings, conscious or unconscious, underlying the quoted statements. Despite the assurances of counsel present when the statements were made that they were made either in jest or purposely were outrageous or sarcastic n14 and used by the judge to emphasize his point in explaining his position, and that no harm was intended, we must consider more. Regardless of intent, it is totally unacceptable for a federal judge -- irrespective of the judge's color -- to make racially insensitive statements or even casual comments of same during the course of judicial proceedings. Such are not to be tolerated in any litigation and most decidedly are verboten in litigation in which racial or ethnic considerations are relevant to an issue before the court. When they occur, the risk of creating a public perception that the judge has a bias or prejudice which might affect the outcome crosses the proscribed threshold. This is especially true in a racially-charged case such as the instant one. Accordingly, here a reasonable person might indeed harbor doubts about the trial judge's impartiality and recusal would be appropriate under the terms of § 455(a). (FIX THIS PLEASE!)

*In re Chevron U.S.A.*, 121 F.3d 163, 166-167 (5th Cir. Tex. 1997)

19

Also on point is *United States v. Antar*, 53 F.3d 568 (3d Cir. N.J. 1995). In Antar, the U.S. Court of Appeals for the Third Circuit dealt with the alleged improper remarks at a defendant's sentencing indicated an extra-judicial bias and prejudice giving rise to disqualification. The Court reversed the Appellees' convictions and remanded the causes for new trials, holing that a new trial was warranted where the judge's remarks would lead a reasonable observer to think that the judge had an improper goal which led to bias and prejudice against the defendant. *Id.*

Appellant is not required to demonstrate prove actual prejudice in order to seek the District Court's recusal. For example, in *Foster*, the court held that an attorney who files a motion for change of judge in good faith is not required to prove actual prejudice by the judge. *State ex. rel. Strain v. Foster*, 537 P.2d 547 (Ore. 1975). In *Roberts*, another case on point, a judge recused himself even though he stated he had no personal bias against the litigant's attorney. The court there stated that the issue of what a reasonable person would think about a judge's impartiality should be approached from the viewpoint of the party to the action. Recusal was necessary because the functioning of the justice system would be impaired if counsel were to go to trial before a judge that counsel thought was biased against him. *Roberts v. Ace Hardware, Inc.*, 515 F. Supp. 29 (N.D. Ohio 1981).

20

Appellant simply seeks to have the District Court's Order vacated so that this case can be given to a judge without a demonstrated bias and prejudice towards Plaintiff.  Discovery in this case had already been completed, and the case was about to be taken to trial, where a jury should have decided whether Appellees had defamed Plaintiff.  The District Court, again showing its bias and prejudice, took this decision out of the hands of the jury and instead disposed of the case in order to spite Plaintiff.

### E. <u>Number of Errors Also Showed Evidence of Bias and Prejudice</u>

It is axiomatic that at a certain point the District Court's errors must be seen for what they are: bias and prejudice amounting to judicial misconduct.  *See* Cynthia Gray, The Line Between Legal Error and Judicial Misconduct: Balancing Judicial Independence and Accountability, 32 Hofstra L. Rev. 1245 (2004).  As Professor Gray's scholarly review of judicial error makes apparent, not all errors committed by judges, who after all have years of legal training and experience, are innocent.  In this case, the District Court

In *Kloepfer v. Commission on Jud. Conduct*, 782 P.2d 239, 253 (Cal. 1989), for example, a judge contended that his failure to respect procedural rights of a defendant had been an atypical, isolated incident and would not recur. Nevertheless, the California Supreme Court held that record revealed a "pattern" of

21

discourtesy, intimidation, and punitive rulings justified his removal from the bench.

Sometimes, even a single act of legal error becomes serious enough to warrant discipline when judges deny individuals their basic or fundamental procedural rights, as when a judge proceeds to adjudication without advising a defendant of the right to counsel, declines to hold a full hearing, or coerces a guilty plea. *See McCullough v. Commission on Jud. Perf.*, 776 P.2d 259, 262 (Cal. 1989) (judge disciplined after directing a verdict of guilty in a criminal trial).

Here, the District Court's actions made more than a sufficient showing of bias and prejudice that necessitated recusal and/or disqualification. Most notably, this Court disallowed and struck punitive damages from Plaintiff's Third Amended Complaint when it was demonstrated to the Court that it was properly pled. The Court even denied Plaintiff's motion to amend even though leave to amend is to be freely granted and Appellant had additionally shown good cause why amendment was necessary.

This issue of punitive damages was one of great importance for both the parties as well as the Court. If this issue of punitive damages, and their inclusion, was not taken to the U.S. Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") via a petition for writ of mandamus, it could have resulted in a massive waste of both parties' and court resources in having to retry an entire jury trial

22

should Appellant have prevailed.  Appellant moved the Court for reconsideration and even asked the Court to certify the question for an interlocutory appeal to the Eleventh Circuit.  When the Court denied both of these motions Appellant was left with no options but to file a petition for writ of mandamus with the Eleventh Circuit.  This petition for writ of mandamus, if granted, would have been a benefit to both parties as well as the Court since it would have saved everyone from having to retry the case.

In addition, Appellant had a right legally to pursue all legal remedies in what he perceives to be a factually and legally incorrect ruling. If Appellant is to be penalized for pursuing his rights, this would work a denial of due process and a manifest injustice. Instead, this Court said in its Order, "[plaintiff] often plunges into a tirade against whomever he feels has wronged him – here, has taken the form of motions to reconsider, objections, and even a petition for writ of mandamus with the Eleven Circuit Court of Appeals." Order at 32 (emphasis added).

As yet another example of extra-judicial bias and prejudice, it is apparent from all the circumstances that the Court intentionally sat on and did not rule on Appellees' Motion for Summary Judgment for four months, refusing to issue a ruling until the eve of the trial. Indeed, Appellees' Motion was filed on October 20, 2014.  Appellant opposed the motion on November 19, 2014 and Appellees filed a

23

reply on December 3, 2014.  The Court did not issue its decision until April 3, 2015, exactly four months after the motion was fully briefed.  More importantly, this date was also only three weeks before the trial was set to begin.  The parties had performed all pre-trial obligations.  The parties prepared jury instructions, issued subpoenas for witnesses, and performed all other items required for trial.

Appellant is representing himself pro se in this matter at great time and expense to himself and his own legal practice. Appellant seeks justice for the harm that was done to him as a result of Appellees' false and defamatory comments and is doing so by pursuing his claims in court.  Appellees, on the other hand, are a large corporation and the money to further continue to "punish" Appellant for daring to bring this lawsuit against them.  Appellees' legal expenses are covered by their insurance company and they have hired a powerful Florida law firm to represent them.  From all the circumstances, it can only be concluded that the Court simply sat on this motion in order to cause Appellant harm, knowing that the closer it got to trial the more Appellant would be preparing for it. Appellant had a right to believe this case was going to trial and Appellant estimates that he spent over $200,000 in time and expenses in preparation for it just during the time period between the date the pleadings were closed concerning Appellees' Summary Judgment Motion and the dismissal of the case, four months later. Thus, the fact that summary judgment was granted so late in the case was severely prejudicial to

24

Plaintiff, and it would appear intentional given all the circumstances set forth herein.

## **CONCLUSION**

For the foregoing reasons, Appellant respectfully requests that this Court reverse and remand the decision of the U.S. District Court for the Middle District of Florida and vacate all District Court Orders, as the trial judge should have recused herself from the case once her bias and prejudice manifested itself.  The District Court clearly erred in determining that Appellant did not show constitutional malice.  At a minimum, Appellant had demonstrated with more than enough direct and circumstantial evidence that Appellees were knowingly making false and defamatory statements or making them with reckless disregard for the truth. Granting summary judgment was improper because it was for the jury to determine whether constitutional malice was present.

**ORAL ARUGMENT IS RESPECTFULLY REQUESTED**

Dated: December 28, 2015

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman
Florida Bar No. 246220
2775 NW 49th Ave., Suite 205-346

Ocala, FL 34483
(310) 595-0800
Email: leklayman@gmail.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,659 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

*/s/ Larry Klayman*
Larry Klayman, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 28th day of December, 2015, a true and

correct copy of the foregoing with the United States Court of Appeals for the

Eleventh Circuit and was served via Appellate CM/ECF to the following:


**Sanford Lewis Bohrer**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
305/374-8500
Fax: 305/789-7799
Email: sbohrer@hklaw.com

**Scott D. Ponce**
Holland & Knight, LLP
Suite 3000
701 Brickell Ave
Miami, FL 33131
305/789-7575
Email: sponce@hklaw.com

*Attorneys for Defendants-Appellees*


/s/ Larry Klayman
Larry Klayman, Esq.